**SEA CONTAINERS LTD., et al., Appellee,**

v.

**STENA AB, et al., Appellant.**

**Nos. 89–7115, 89–7146, 89–7147.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1989.

Decided Dec. 1, 1989.

Robert E. Zimet, New York City, with whom John M. Nannes and Richard L. Brusca, Washington, D.C., were on the brief for appellants Stena Finance AB, et al. in 89–7115 and 89–7146.

Douglas D. Broadwater, New York City, with whom John H. Pickering, Max O. Truitt, Jr., and James Robertson, Washington, D.C., were on the brief for appellant Tiphook plc in 89–7147.

Paul L. Friedman, Washington, D.C., with whom John J. McAvoy, Washington, D.C., was on brief for appellees Sea Containers Ltd., et al.

Before: SILBERMAN, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

These appeals arise out of the cross-fire between the parties to a hostile tender offer. The tender offer was launched by Stena Finance B.V., a Netherlands corporation, and Tiphook plc, an English company, acting through their joint subsidiary, Temple Holdings Ltd., a Bermuda corporation. The target is Sea Containers Ltd., also a Bermuda corporation.

The battle was first heralded on March 13, 1989, when Stena Finance B.V., its parent AB Stena Finans, its grandparent Stena AB, and the grandparents' sole stockholders Dan Sten Olsson and Sten Allan Olsson (hereinafter collectively "Stena" or "the Stena parties"), filed with the Securities and Exchange Commission a Schedule 13D reporting that they had acquired more than 8% of the common stock of Sea Containers. Sea Containers promptly entered the lists by filing suit in district court against Stena, challenging the accuracy of its Schedule 13D. The Stena parties then counterclaimed against Sea Containers, its president James Sherwood, and three wholly owned subsidiaries—Sea Containers House Ltd., Marine Container Insurance Co. Ltd., and Strider 8 Ltd.—(hereinafter collectively "Sea Containers" or "the Sea Containers parties") for violations of fiduciary duty, of Bermuda company law, and of United States securities laws. Included in the last category was a claim that the Sea Containers parties failed to file, or filed false and misleading, Schedules 13D in connection with their purchases of Sea Containers stock pursuant to an announced share repurchase program.

Stena appeals the district court order denying its motion for a preliminary injunc-

tion requiring Sea Containers, its subsidiaries, and Sherwood to amend their Schedules 13D, and prohibiting them from trading in Sea Containers stock for 30 days thereafter. We affirm that order because we find that Stena failed to show the requisite degree of irreparable harm to warrant preliminary relief.

Stena, joined by Tiphook, also appeals the district court's grant of Sea Containers' motion for a preliminary injunction restraining Stena from pursuing its tender offer for the shares of Sea Containers. The district court issued that order after Stena sued Sea Containers in Bermuda and there obtained a preliminary injunction preventing the Sea Containers parties from dealing in Sea Containers stock. We stayed the district court's anti-tender offer injunction on June 23, 1989. We now reverse the district court and vacate the injunction because it lacks any basis in law.

## I. BACKGROUND

When a person or a group of persons acting in concert acquires beneficial ownership of more than 5% of any class of equity securities, section 13(d) of the Securities Exchange Act of 1934 (the "Williams Act"), 15 U.S.C. § 78m(d), requires that person or group within ten days to file with the Securities and Exchange Commission a statement, called a Schedule 13D, containing certain information specified by statute and regulation. *See* 17 C.F.R. § 240.13d–101. The items of information at issue in this case are whether the filing party is part of a "group" of persons acting in concert, and the "purpose" for which the acquisition was made. *See* 15 U.S.C. § 78m(d)(1)(C)–(D).

When the Stena parties filed a Schedule 13D disclosing the acquisition of 927,700 shares of common stock (8.17%) of Sea Containers, they stated that they acquired the stock as "an attractive investment opportunity" and that they were "consider[ing] a number of possibilities including ... a business combination or acquisition of all or part of [Sea Containers'] businesses." Sea Containers' complaint in district court alleged that Stena's Schedule 13D

was false and misleading, however, because it failed to reveal that Stena's true purpose in acquiring the stock was to gain control of Sea Containers.

Stena's counterclaim alleged, *inter alia,* that Sherwood violated the Williams Act by failing to amend the Schedule 13D he had filed on May 21, 1987, reporting his ownership of 7.3% of the company's stock, to disclose that he had since directed and approved Sea Containers' adoption of various anti-takeover measures; and that he and the subsidiaries violated the Act by failing to report that they were acting as a group. Thereafter, Sherwood and two of the Sea Containers subsidiaries filed a joint Schedule 13D reporting aggregate holdings of 19.6% of Sea Containers common stock, but stating that their filing jointly "should not be deemed to be an admission that the Reporting Persons are members of a group for the purposes of Section 13(d)." Four days later the same Reporting Persons and the third Sea Containers subsidiary filed a new Schedule 13D reporting an aggregate position exceeding 30% of Sea Containers stock and again cautioning against the inference that they were acting as a "group."

Stena amended its counterclaim and moved for a preliminary injunction on the basis of its claim that the Sea Containers parties' Schedule 13D contained four inaccuracies: the "purpose" and "groupness" at issue here, one concerning the percentage of the stock owned and able to be voted by the Reporting Persons, and another concerning the source of funds for the subsidiaries' purchases. Stena asked the district court both to order the Sea Containers parties to correct their Schedule 13D and to impose a 30 day "cooling-off period" during which they would be barred from trading in Sea Containers stock. On May 8, 1989, the district court denied Stena's request for a preliminary injunction, ruling that Stena had failed to establish a likelihood of success on the merits and that Sea Containers had made sufficient disclosure to the public.

On May 26, Temple Holdings announced its tender offer and, together with Stena, sued the Sea Containers parties in the ap-

propriate Bermuda trial court, challenging the legality, under Bermuda law, of the poison-pill shareholder rights plan that Sea Containers had adopted the previous year and arguing, again under Bermuda law, that Sea Containers and its subsidiaries could not lawfully deal in Sea Containers stock. The Bermuda court issued an *ex parte* order restraining Sea Containers from implementing the poison pill or acquiring or selling any Sea Containers shares. On June 9 the Bermuda court continued the injunction, having found at the first *inter partes* hearing, which was held on June 1, that Stena had presented an "arguable case" and that the shareholders might otherwise be done "irreparable damage."

Also on June 1, Sea Containers moved in district court for a temporary restraining order enjoining Stena from seeking an extension of the Bermuda injunction or, as an alternative, restraining Stena from pursuing the tender offer. Because the Bermuda hearing had been set for 9:00 a.m. Eastern Time, the district court held a morning telephone hearing; at the close of the hearing it advised counsel that it would issue a temporary restraining order barring Stena from dealing in the shares of Sea Containers, "effective immediately." On the following day the district court issued a written order to that effect, and a memorandum opinion issued on June 5. The temporary restraining order read as follows:

> [T]he defendants and counterclaimant and . . . all other persons acting in concert or participation with them or on their behalf, are temporarily enjoined from purchasing or dealing in . . . any shares of Sea Containers Ltd. stock pursuant to the tender offer for Sea Containers Ltd. or otherwise, and from pursuing, facilitating, consummating . . . the tender offer or any purchases of shares pursuant to the tender offer, or otherwise, and from exercising or procuring the exercise of any voting or other right attached to the shares of Sea Containers Ltd., except that nothing in this Order shall prevent any party from complying with its federal securities law obligations to make public disclosures.

The district court later embodied these terms in a preliminary injunction, and denied Stena's motion for a stay pending appeal. On June 23, we stayed the preliminary injunction, and on July 6, Chief Justice Rehnquist, in chambers, denied Sea Containers' application to vacate our stay. Letter from Joseph F. Spaniol, Jr., Clerk of the Supreme Court, to John Nannes (July 6, 1989).

## II. ANALYSIS

Although the decision whether to grant a preliminary injunction under Rule 65(a), Fed.R.Civ.P., is left largely to the discretion of the trial court, its exercise of that discretion is subject to the Supreme Court's repeated admonition regarding the caution with which the district court should order any injunctive relief. As reiterated most recently in *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982): "An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Id.* at 312, 102 S.Ct. at 1803 (*quoting Cavanaugh v. Looney*, 248 U.S. 453, 456, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919)); *see also Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987).

As that standard is applied in this Circuit, preliminary relief is to be granted only if the moving party establishes that (1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction. *See Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 151 (D.C.Cir.1985); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977).

Because the decision whether to grant a preliminary injunction is committed to the discretion of the district court, our review is concomitantly deferential. *See Romero–*

*Barcelo,* 456 U.S. at 312, 102 S.Ct. at 1803; *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *National Wildlife Federation v. Burford (NWF),* 835 F.2d 305, 319 (D.C. Cir.1987); *Foundation on Economic Trends,* 756 F.2d at 151. The district court makes findings of fact, draws conclusions of law, and balances the factors set out above. *See NWF,* 835 F.2d at 319. The appellate court does not sit to retry the facts; we look only for assurance that the district court's findings are not clearly erroneous. The district court's reading of the law is not entitled to the same degree of deference, and will be reversed if merely erroneous. Finally, because the decision to grant injunctive relief is a discretionary exercise of the district court's equitable powers often based upon an only partially-developed record, we will uphold its balancing of the four injunction factors absent a clear abuse of discretion. *See NWF,* 835 F.2d at 319; *Foundation on Economic Trends,* 756 F.2d at 151–52.

We review the district court's rulings with these considerations in mind.

A. *Denial of Preliminary Injunction Requiring Sea Containers to Make Further § 13d Disclosures*

■ Persons who agree to act in concert in dealing in securities, deemed a "group" for purposes of the Williams Act, must jointly file a single Schedule 13D that identifies all members of the group. 17 C.F.R. § 240.13d–5(b)(1). Like an individual Reporting Person, the group is required to disclose in the Schedule 13D the "purpose or purposes" for which they acquired the securities about which they are reporting. 17 C.F.R. § 240.13d–101(4).

The Schedules 13D filed by Sherwood and the Sea Containers subsidiaries stated that their purchases were made for "general investment purposes." Stena argues that the purchases were made in order to thwart its effort to take over Sea Containers, and that Sea Containers' failure to reveal its defensive purpose subverts the intent of § 13(d) to "allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation." *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1165 (D.C.Cir.1978).

1. *Purpose of Purchases*

The district court's findings on the issue of Sea Containers' purpose were brief. Referring in part to material filed under seal, on which it did not (nor shall we) elaborate, the court "recognize[d] that the flurry of activity" by Sea Containers following Stena's 13D filing "does suggest that Sea Containers has implemented takeover defenses." Noting, however, that Sea Containers had annexed Stena's counterclaim as an exhibit to its 13D filing, the court found "that Sea Containers' statement of the purpose of the purchase of shares, with the accompanying exhibits to the 13D filings, conforms with the intent of securities disclosure law."

Stena asserts that the district court committed an error of law by allowing Sea Containers to satisfy the disclosure requirement, even for the nonce, merely by annexing Stena's counterclaim to its Schedule 13D. Sea Containers' defense of the district court's decision emphasizes the preliminary nature of its ruling: the company does not contend that annexing such an adverse claim would be a sufficient final remedy if Stena's allegations were proved to be true; on the contrary, it acknowledges that a Schedule 13D must be corrected if it is found to be false and misleading. *See Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1501 (D.Del. 1984); *see also Savoy,* 587 F.2d at 1165.

In ruling on the issue of Stena's entitlement to preliminary relief, the district court did not, of course, resolve the merits of Stena's claim that the true purpose of Sea Containers' purchases was to defend against a possible takeover; that underlying question of fact still remains to be answered. Accordingly, the issue before this court is not whether such annexation would ultimately be an adequate remedy if the Schedule 13D fails to disclose a material fact, but whether annexation constitutes a sufficient disclosure of the possibility of an anti-takeover purpose to sustain the dis-

trict court's discretionary determination that the balance of relevant factors does not require it to issue a preliminary injunction against the Sea Containers' parties further dealing in Sea Containers shares until the matter is finally resolved. In essence, Stena's argument—that disclosure of the dispute is inadequate to protect it and the public—puts it in the position of insisting upon Sea Containers' disclosing an anti-takeover purpose that it vehemently denies, that has not been shown to exist, and that Stena will have an opportunity to establish in the merits phase of this litigation.

Even if, as the district court may have intimated, Stena is likely to succeed on its purpose claim, it would hardly seem proper for the district court to order Sea Containers to "disclose" what it denies (presumably noting its denial and the pendency of the question in litigation) unless Stena could make an impressive showing that it or the public would otherwise suffer an irreparable injury.

Stena argues nonetheless that the federal district court for Delaware, which is a weighty authority on an issue such as this, supports its argument for preliminary relief to "correct" the falsity of Sea Containers' purpose statement. In *Warner*, that court denied a motion to dismiss a similar "purpose" claim even though the Reporting Persons had amended their Schedule 13D to disclose the existence of a dispute about their true purpose by attaching as an exhibit to the Schedule the pleadings filed against them. The court indeed held, as Stena argues, "that the amendment did not cure the omission in [the] Schedule 13D filings"; and it did say, as Stena points out, that:

> Although the federal securities laws do not require a person to publicly confess to engaging in illegitimate or illegal conduct, the securities laws do require disclosure of material facts relating to a person's action. In this respect, § 13(d) and rules promulgated thereunder expressly require disclosure of a person's purpose for acquiring 5% or more of a company's stock.

581 F.Supp. at 1501. In the very next sentence, however, the court went on to explain that when it has before it a "challenge [to] the sufficiency and truthfulness of [a Schedule 13D] disclosure of the purpose of [a transaction,] the Court may not rule upon the merits of this factual claim on ... motions to dismiss." *Id.* Thus, the *Warner* court held that if the disclosing party is found on the merits to have filed a false Schedule 13D, that party cannot cure the defect merely by annexing an adverse claim. That point is not here in controversy, and *Warner* does not address the issue that is in contention here: whether such annexation may be sufficient to defeat a claim of irreparable harm in a motion for preliminary relief.

Stena argues in the alternative that it suffers irreparable harm because, in its words, "the filing of a materially false and misleading Schedule 13D constitutes irreparable harm *per se*," a proposition for which it claims support in *General Aircraft Corp. v. Lampert*, 556 F.2d 90 (1st Cir. 1977). The court there affirmed a preliminary injunction by reference, without extended discussion, to the "irreparable injury [that] would occur to shareholders and the investing public if appellants were allowed to continue their activities without correcting and amplifying their Schedule 13D." *Id.* at 97. The court also said, however, that it was "guided by the [then] recent Supreme Court decision" in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 64–65, 95 S.Ct. 2069, 2078–79, 45 L.Ed.2d 12 (1975), in which, it acknowledged, "the Supreme Court explicitly rejected the argument that a violation of the Williams Act, without more, justifies the issuance of an injunction; [on the contrary,] in accordance with traditional equitable principles a showing of irreparable harm must be made." 556 F.2d at 96. It would therefore make sophistry and nonsense of the First Circuit's opinion to conclude that it nonetheless endorsed a theory of *per se* irreparable harm. We prefer to think it was simply a bit opaque as to the nature of the irreparable injury.

We conclude that Stena failed to carry its necessary burden of showing sufficient ir-

reparable harm to command a preliminary injunction from the district court. Even if it is proved ultimately to be correct in maintaining that appellees' Schedule 13D is false and misleading, the annexation of Stena's complaint would appear to offset most if not all possible adverse consequences of the misrepresentation. There is no evidence, nor much room for suggestion either, of any real danger that investors will be unaware of the possibility that the Sea Containers parties will vote their shares in such a way as to fend off Temple Holdings' unwelcome tender offer. It is unlikely that anyone could, by virtue of Sea Containers' omission of any reference to defensive tactics and its profession of a "general investment purpose," be lulled into thinking that Sea Containers might not at any moment use its stockholdings to cause the company to take overtly defensive steps—whether by reason of a change of purpose or because that has been their unacknowledged purpose all along. When the contravening complaint was coupled with the Schedule 13D, everyone was apprised of that possibility.

Thus, while the district court found that the facts "suggest" a defensive purpose, a possibility that would occur to anyone who is not completely unfamiliar with the market for corporate control—small investors from outer space, perhaps?—it also found that the case for a defensive purpose was less than complete. In light of the limited potential for harm and the remaining doubt about whether Sea Containers' purpose was in fact defensive, the district court did not abuse its discretion when it denied Stena's motion for an injunction requiring disclosure of such a purpose.

### 2. The Formation of a "Group"

The district court did not finally determine whether the Sea Containers parties were acting as a group; instead, it found that

> on the present record [their] joint filings [are] in accordance with 13(d)(1) [the filing requirement] and that 13(d)(3) [the group provision] is not triggered in this case. There is adequate disclosure to the

public regarding the recent purchase of Sea Containers stock.

Nor need we now decide whether Sea Containers *et al.* were acting as a group. Because all members of the putative "group" filed the joint Schedule 13D, the only issue before us is whether their failure to state in that filing that they were acting as a "group" warrants issuance of a preliminary injunction.

Neither the statute nor the SEC's regulations expressly require that a Reporting Person state that he is acting as part of a group; rather they require that when two or more persons are acting in concert, they file as would a single person. *See* 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d–5(b)(1). Regardless of whether the Reporting Persons are ultimately determined to have been a group when they made their joint filing disclaiming such status, we must affirm the District Court's holding that a preliminary injunction is not required, because Stena failed to show that, notwithstanding the joint filing with the complaint annexed, it would suffer irreparable injury if it were denied such relief.

Stena asserts that "Sea Containers' shareholders ... are forced to make investment decisions without full and accurate disclosure of material information" regarding, *inter alia*, the status of the Sea Containers parties as a "group." In our view, however, their joint filing served substantially to mitigate, if it did not altogether eliminate, the harm alleged. Not only were all members of the claimed group parties to the filings, but as Stena conceded at oral argument, the relationships among the parties—*i.e.*, that the corporate Reporting Persons are wholly-owned subsidiaries of Sea Containers Ltd., and that Sherwood is the president of Sea Containers—were accurately set forth in the Schedule 13D. This, along with the annexation of Stena's complaint, provided sufficient notice, even if it is later determined that the Reporting Persons were acting as a "group," to support the district court's denial of preliminary relief for want of irreparable harm.

### B. *The Injunction Against Stena*

■ The district court stated that its "purpose ... in granting injunctive relief" against Stena's further dealing in shares of Sea Containers was "to place the parties in the position where they were before the entry of injunctive relief by the Bermuda court." In other words, now that Sea Containers could not deal in its own shares, neither would Stena be allowed to do so. Sounds evenhanded, perhaps, but does it stand upon more than the chancellor's foot?

To be sure, before issuing the injunction, the district court applied this Circuit's four-part test for injunctive relief, which we have set out above. In reaching the conclusion that Sea Containers "was likely to prevail on the merits of this litigation," however, the district court considered only Stena's counterclaims, as to which Sea Containers was the defendant. That Sea Containers may prevail against all counterclaims says nothing about its entitlement to injunctive relief, of course. Unfortunately, neither did the district court. It did not identify any claim made by Sea Containers and against Stena as to which restraint of the tender offer would be a proper remedy.

Even Sea Containers does not pretend on this appeal that it has made the showing of probable success on the merits usually required for the issuance of a preliminary injunction; instead, it argues that the order was justified as an exercise of the district court's inherent power "to preserve the integrity of the processes of the federal courts" in the face of "improper forum shopping." In particular, Sea Containers argues that by seeking in a foreign court the same relief that the district court had refused them, Stena and Tiphook threatened to subvert the court's "jurisdiction" and to evade "important public policies." If that is so, the argument goes, then the court would have been justified in issuing an anti-suit injunction, as Sea Containers initially requested, and the anti-tender offer injunction it issued instead should be upheld because it is a "less intrusive sanction."

We note that Sea Containers makes no argument to support the anti-tender offer injunction as such, *i.e.*, apart from its being less intrusive than an anti-suit injunction; under Sea Containers' approach, therefore, everything turns upon whether an anti-suit injunction would have been justified.

#### 1. *Protecting the Jurisdiction of the Court*

In *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir.1984), a British airline (Laker) filed an action in district court, under the antitrust laws of the United States, against several domestic and foreign defendants. The foreign defendants then sued in the High Court of Justice, United Kingdom, and obtained an injunction prohibiting Laker from prosecuting its action against them. Laker in turn obtained from the district court an injunction restraining the American defendants, as well as certain foreign defendants that it had sued in a second antitrust action, from seeking in a foreign court an injunction preventing Laker from pursuing its antitrust action against them. We affirmed the district court's anti-suit injunction, explaining that, had the remaining defendants first obtained an injunction from a foreign court, the district court "would have been effectively stripped of control over the claims—based on United States law—which it was in the process of adjudicating." There unquestionably was a threat to the jurisdiction of the district court in *Laker*, therefore: the foreign litigation enjoined had been initiated "for the sole purpose of terminating the United States claim." *Id.* at 915.

Here, in contrast, there is no discernible threat to the jurisdiction of the district court; Sea Containers identifies only the possibility that, as a result of the injunction issued by the Bermuda court, the present management of Sea Containers will be unable to defeat the tender offer, with the result that Temple Holdings will get control of Sea Containers and cause it to dismiss its complaint. That is a threat not to the jurisdiction of the court but to the plaintiff's continuing interest in prosecuting its lawsuit. The injunction issued by

the district court is therefore inconsistent with the "fundamental corollary" to the principle of concurrent jurisdiction as we stated it in *Laker:* "parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." 731 F.2d at 926–27. "[T]he duplication of parties and issues alone is not sufficient to justify issuance of an anti-suit injunction." *Id.* at 928.

Sea Containers contends for a more aggressive reading of *Laker,* based upon the district court's decision in *American Horse Protection Ass'n v. Lyng,* 690 F.Supp. 40 (D.D.C.1988). The district court there enjoined the prosecution, in another federal court, of a later-filed suit raising closely related issues arising out of the same facts, in which it saw an "attempt[ ] to divest [it] of the jurisdiction that it clearly has over the issues raised in the [second action]." *Id.* at 44.

Referring to a prior decision in which we directed the district court to enjoin the defendant from prosecuting in another district an action that should have been filed as a counterclaim in the case before us, the court noted that:

> In this Circuit, the factors central to the issue of enjoining the prosecution of a later-filed action in another district relate to the conservation of judicial resources and comprehensive disposition of litigation. *Columbia Plaza Corp. v. Security National Bank,* 525 F.2d 620, 627–28 (D.C.Cir.1975). These factors include: the identity of the parties; the risk of inconsistent adjudications; the location of counsel familiar with the litigation; how far advanced each action is; and, in general, "equitable considerations genuinely relevant to the ends of justice," relating to the expeditious determination of the case without "unnecessary multiplication of litigation." *Id.* at 626–29.

690 F.Supp. at 42–43.

*American Horse* is clearly a creature of its context, in which two federal courts entertained jurisdiction over claims arising out of essentially the same facts. In that setting, it was certain that the resources of the federal judicial system would be wasted unless one of the courts required one of the parties to withdraw one of the actions: otherwise whichever court reached a decision first would bind the parties, and the other federal court would have expended its time for nothing.

When a second action is brought in a foreign court, however, the possible waste of resources entailed may be outweighed by another concern, international comity. *See Laker,* 731 F.2d at 927; *id.* at 956 (Starr, J., dissenting). As the Second Circuit has said:

> The fact that the injunction operates only against the parties, and not directly against the foreign court, does not eliminate the need for due regard to principles of international comity, *Peck v. Jenness,* 48 U.S. (7 How.) 612, 625 [12 L.Ed. 841] (1849), because such an order effectively restricts the jurisdiction of the court of a foreign sovereign, *U.S. v. Davis,* 767 F.2d [1025,] 1038 [ ( 2d Cir. 1985) ]. Therefore, an anti-foreign suit injunction should be "used sparingly," *U.S. v. Davis,* 767 F.2d at 1038, and should be granted "only with care and great restraint." *Canadian Filters (Harwich) v. Lear–Siegler,* 412 F.2d 577, 578 (1st Cir.1969); *see Laker v. Sabena,* 731 F.2d at 927; *Compagnie Des Bauxites De Guinea v. Insurance Co. of N. Am.,* 651 F.2d 877, 887 (3d Cir.1981) [, aff'd, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) ].

*China Trade and Development v. M.V. Choong Yong,* 837 F.2d 33, 35–36 (2d Cir. 1987).

Accordingly, the Second Circuit held in the case just cited that "the initiation before a foreign court of a suit concerning the same parties and issues as a suit already pending in a United States court does not, without more, justify enjoining a party from proceeding in the foreign forum." Indeed, that the parallel foreign proceeding would be "vexatious" to the domestic plaintiffs and a race to judgment causing additional expense are not sufficient additional considerations but only

"factors ... likely to be present whenever parallel actions are proceeding concurrently...." Following our decision in *Laker*, the Second Circuit asked instead only "whether the foreign action threatens the jurisdiction of the enjoining forum, and ... whether strong public policies of the enjoining forum are threatened by the foreign action." *Id.* at 36. Since the foreign court in that case had "not attempted to enjoin the proceedings" in the United States, neither it nor the domestic defendant/foreign plaintiff "sought to prevent the [district court] from exercising its jurisdiction over th[e] case," *id.* at 37, and no anti-suit injunction could be justified on that account.

The present case is even less of a threat to the jurisdiction of the district court because the foreign action does not involve "the same liability issue as that before the [district court]." *Id.* at 37. As we have said, the Bermuda action between the parties involves only issues of Bermuda company law. Thus, even if the Bermuda court reached a decision first, it would not deprive the district court of its jurisdiction over the federal securities issues. Also because the issues are different, there is no reason to fear that the foreign court has any institutional interest that would be served by its enjoining the district court plaintiff from pursuing its case, and Sea Containers does not suggest the contrary.

Sea Containers argues, nonetheless, that Stena should be sanctioned for seeking from a Bermuda court the same relief that it was unable to convince the district court to grant. Although Stena did file suit in the Bermuda court after attempting first to raise its Bermuda law claims in the United States, the district court did not find fault with Stena for filing the Bermuda action; on the contrary, it seemed to agree, as Sea Containers had earlier "conceded, and even argued[,] that a Bermuda court should ultimately determine Bermuda law." It objected only to the injunctive relief sought and obtained from the Bermuda court, on the ground that:

> when Stena sought to, in effect, overturn the decision of this Court in denying injunctive relief, and the decision of the Court of Appeals in denying expedited

consideration of Stena's appeal, after having submitted itself to the jurisdiction of this court, it challenged the jurisdiction of this court.

Having once been asked for, and having denied such relief did not, however, give the district court sole "jurisdiction" to grant it. In short, because the Bermuda action poses no threat to the jurisdiction of the district court, it is no basis for the anti-suit injunction here.

### 2. *Preventing Evasion of Forum Public Policy*

In an effort to justify the injunction issued by the district court as necessary to vindicate "the forum's important public policies," *Laker*, 731 F.2d at 931, Sea Containers points to two policies: "finality of litigation" and "respect for the orders of U.S. courts and judicial processes," both of which it claims are affronted by Stena's international forum-shopping.

Sea Containers presents no convincing argument that Stena evaded any public policy of the United States by its filing in Bermuda. Stena's ability to bring its counterclaim in district court and then repair to a foreign court with a lower standard for preliminary relief (an "arguable case" is enough) allows it to burden its adversary, but it does not represent an "evasion of forum law and policy" that justifies injunctive relief. *Cf. Laker*, 731 F.2d at 931 n. 73 ("the availability of slight advantages in the substantive or procedural law to be applied in the foreign court does not signify an actionable evasion of domestic public policy"). By seeking in Bermuda the same relief the district court had denied, Stena neither violated any order of the district court nor, since the district court had denied relief only upon the different claim before it, showed any disrespect for the court's processes.

Finally, we address Sea Containers' argument that Stena's conduct is analogous to that of a vexatious litigant, against whom the district court may invoke its equitable power in order to prevent frivolous impositions upon its time. Courts

need not stop to find all the usual prerequisites for equitable relief when they are acting to "protect their jurisdiction from conduct which impairs their ability to carry out Article III functions." *In re Martin-Trigona*, 737 F.2d 1254, 1261 (2d Cir.1984). The undoubted power in a court of equity to enjoin a litigant from "flooding the court with meritless, fanciful claims" and interfering with "the orderly and expeditious administration of justice," *Urban v. United Nations*, 768 F.2d 1497, 1499, 1500 (D.C. Cir.1985), is not relevant to this case, however. Stena did not add anything to the district court's burden when it took its Bermuda law claims to Bermuda.

Neither the district court nor Sea Containers on appeal has identified any legal basis upon which we can sustain the anti-tender offer injunction. The district court thus had no equitable power to countervail the effect of the Bermuda court's anti-tender offer injunction, even if the offense to its authority that the court perceived, and the inequity that the foreign injunction may, in its view, impose upon Sea Containers were more real than imagined. As we said when staying the district court injunction pending appeal, "[n]otions of 'fairness' cannot replace legal bases for judicial decisions."

### III. Conclusion

For the foregoing reasons, the district court order denying Stena's motion for an injunction is affirmed, the order enjoining Stena from pursuing its takeover bid is reversed, and the temporary restraining order is vacated. The case is remanded for further proceedings.

*So ordered.*