**Rodney BRADSHAW, Plaintiff,**

v.

**Ann VENEMAN, et al., Defendants.**

**George Hildebrandt, Jr. and Patricia Hildebrandt, Plaintiffs,**

v.

**Ann Veneman, et al., Defendants.**

**Nos. CIV.A. 04–1422(PLF), CIV.A. 04–1423(PLF).**

United States District Court, District of Columbia.

Oct. 12, 2004.

James W. Myart, Jr., San Antonio, TX, for Plaintiff.

Brian G. Kennedy, Michael Sitcov, United States Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

PAUL L. FRIEDMAN, District Judge.

On October 6, 2004, plaintiff Rodney Bradshaw filed a motion for a temporary restraining order and temporary injunction, seeking to restrain the defendants from executing any administrative offset against him and directing defendants to return all administrative offsets taken during the past five years.[1] The Court directed the defendants to respond by the end of the day on October 7, 2004, and held a hearing on the morning of October 8, 2004.

The parties agree that, on October 8, 2004, an approximately $16,000 check for a countercyclical payment, which would otherwise have been delivered to Mr. Bradshaw, was instead to be administratively offset against his existing debt. Counsel for defendants represented to the Court at

---

**1.** Plaintiff's proposed order also requested that defendants be restrained from executing procedures to foreclose on plaintiff's farmland. There has been no evidence presented, however, that any foreclosure is imminent. This opinion, therefore, addresses only plaintiff's claims regarding administrative offsets.

the hearing that Mr. Bradshaw's check will be held and not used as an administrative offset pending the outcome of this request for temporary injunctive relief.

On October 7, 2004, plaintiffs George and Patricia Hildebrandt also filed a motion for a temporary restraining order and temporary injunction requesting the same relief as Mr. Bradshaw.[2] The defendants filed an opposition that same day. No mention of an immediate administrative offset was made in the motion. In open court, counsel for the Hildebrandts represented that he believed an administrative offset was upcoming in the next five to ten days. Counsel for defendants indicated that, in fact, an administrative offset of $1471 was taken on October 7, 2004 and that approximately $700 in payments are to be offset over the next six months.

### A. Standards for Injunctive Relief

▆ In deciding whether to grant emergency injunctive relief, the Court must consider (1) whether there is a substantial likelihood that plaintiffs will succeed on the merits of their claims, (2) whether plaintiffs will suffer irreparable injury absent an injunction, (3) the harm to defendants or other interested parties (the balance of harms), and (4) whether an injunction would be in the public interest or at least not be adverse to the public interest. *See Serono Laboratories, Inc. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998); *Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *Milk Industry Foundation v. Glickman,* 949 F.Supp. 882, 888 (D.D.C.1996).

▆ Plaintiffs are not required to prevail on each of these factors. Rather, under *Holiday Tours,* the factors must be viewed as a continuum, with more of one factor compensating for less of another. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d at 843–45. In sum, injunctive relief may be granted "with either a high probability of success and some injury, or vice versa." *Cuomo v. United States Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C.Cir.1985).

▆ Plaintiffs have captioned their motions as applications for temporary restraining orders and temporary injunctions. While the purpose of a temporary restraining order is to preserve the *status quo* and prevent imminent harm pending fuller briefing and a hearing on the request for injunctive relief, the Court must still consider the traditional four-part test for injunctive relief even at the TRO stage. *See Barrow v. Graham,* 124 F.Supp.2d 714, 715–16 (D.D.C.2000). While it is not clear whether plaintiffs intended the term

---

2. The Hildebrandts' motion again asked that defendants be restrained from executing procedures to foreclose on their farmland. Again, no evidence has been presented that any foreclosure is imminent.

"temporary injunction" to mean a preliminary injunction or whether it was just a redundancy in the caption of the applications, the Court has now received briefs from both sides and has heard the arguments and proffers of counsel in open court. The Court therefore will treat plaintiff's applications as motions for preliminary injunctions.

## B. Likelihood of Success on the Merits

■ Chapter 37 of the United States Code provides that "[b]efore discharging any delinquent debt owed to any executive ... agency, the head of such agency shall take all appropriate steps to collect such debt, including (as applicable) ... administrative offset." 31 U.S.C. § 3711(g)(9). An "administrative offset" means withholding funds otherwise payable to a person to satisfy a claim by the United States against that person. *See* 31 U.S.C. § 3701(a)(1). Section 3716 sets out the requirements that the agency must fulfill prior to collecting debt by administrative offset. It provides, among other things, that the agency must either adopt the regulations regarding collection by administrative offset promulgated by the Department of Justice, the General Accounting Office, or the Department of the Treasury or "prescribe regulations on collecting by administrative offset consistent with the regulations" of those departments or agencies. 31 U.S.C. § 3716(b). The Department of Agriculture ("USDA") regulations regarding collection by administrative offset can be found at 7 C.F.R. § 792.7.

The government maintains, and plaintiffs do not dispute, that in the case of Mr. Bradshaw, the administrative offsets at issue in his request for injunctive relief are with respect to loans made to him in 1979 and 1996 which are now delinquent. In the case of the Hildebrandts, the loans are from 1981 and 1984, they were reamortized in 1991, and they are now delinquent. Other than the 1979 loan, these loans all fall within the class period of *Pigford v. Veneman,* Civil Action No. 97–1978.[3] There is no dispute that all plaintiffs in these suits were *Pigford* class members and filed claims through the *Pigford* claims process established by the Consent Decree settling the case. In both cases, plaintiffs' claims were denied. Plaintiffs currently have petitions pending for Monitor review before the Monitor appointed by the Court under the Consent Decree. Even though both Mr. Bradshaw and the Hildebrandts have filed these new lawsuits alleging actions that took place after the *Pigford* class period, therefore, the administrative offsets at issue in *these* applications for temporary injunctive relief result from either (1) loans which predate *Pigford* or (2) claims that were a part of the *Pigford* lawsuit. This Court has no jurisdiction over claims predating *Pigford.* Claims regarding loans incurred during the class period were extinguished when the Consent Decree was approved by the Court in April 1999, *see* Consent Decree ¶ 17, and those claims therefore must be analyzed under the terms of the Consent Decree.

The Consent Decree established certain protections for *Pigford* claimants during the pendency of the claims process estab-

---

**3.** Although it was not discussed in Court, the Hildebrandts' papers indicate that they filed a complaint of discrimination with the USDA Office of Civil Rights in November of 1997. It is unclear as to what alleged actions, or failures to act, on the part of USDA were implicated by this complaint. After various delays, it appears that plaintiffs' complaint was finally considered and denied on June 29, 2004. It is unclear, however, how these more recent developments relate to administrative offsets occurring as a result of debt incurred during the *Pigford* class period.

lished by the Consent Decree. Because plaintiffs are still in the *Pigford* claims process, now before the Monitor for review of the denial of their claims, the protections granted by the Consent Decree must be considered. The Consent Decree specifically provides that:

> Upon being advised by the facilitator that a claimant satisfies the class definition in ¶ 2(a), above, or that a claimant has met the criteria for equitable tolling under ¶ 6, above, USDA shall immediately cease all efforts to dispose of any foreclosed real property formerly owned by such person. USDA also will refrain from foreclosing on real property owned by the claimant or accelerating the claimant's loan account; however, USDA may take such action up to but not including foreclosure or acceleration that is necessary to protect its interests. USDA may resume its efforts to dispose of any such real property after a final decision in USDA's favor on the class member's claim pursuant to ¶¶ 9 or 10, below.

Consent Decree ¶ 7. The government explained during oral argument that the term "final decision" in Paragraph 7 means a final decision after the end of the Monitor review process. The government elaborated that even if a claimant has had his or her claim denied under either Track A or Track B, the protections of Paragraph 7 are not lifted until the Monitor review process is concluded.[4] Because plaintiffs are still engaged in the *Pigford* claims process, therefore, it follows that plaintiffs are still covered by the protections of Paragraph 7 even though their initial claims were denied.

As the government noted at oral argument, protection from administrative offsets is not one of the protections provided by Paragraph 7 of the Consent Decree. Paragraph 7 prohibits only three things: foreclosures on real property owned by claimants, disposal of already foreclosed property, and acceleration of claimants' loan accounts. *See* Consent Decree ¶ 7. Administrative offsets are not mentioned at all in this "freeze" provision. Furthermore, the Consent Decree states quite clearly that "USDA may take such action up to but not including foreclosure or acceleration that is necessary to protect its interests." *Id.*

The Monitor's Update, entitled "Freeze on USDA Acceleration and Foreclosures," which was originally issued on August 31, 2000 and was revised on October 1, 2003, further explains the freeze provisions.[5] It begins: "Under the Consent Decree, USDA is free to take action on a debt during the Monitor petition process. USDA, however, has voluntarily agreed to freeze some actions on debts for claimants who filed a petition for Monitor Review." Monitor's Update: Freeze on USDA Acceleration and Foreclosures at 1. The Update explains that, during the duration of the USDA freeze, the government will not (1) accelerate loans of certain claimants, (2) foreclose on certain debts, or (3) dispose of inventory property that the USDA acquired through foreclosure that once belonged to certain claimants. *See id.* at 1–2. Specifically with respect to administrative offsets, however, the Update explains:

> The freeze does not stop USDA from recovering debts owed to the government by using administrative offset. If,

---

4. Where the Monitor directs the facilitator, adjudicator, or arbitrator to reexamine a claim, *see* Consent Decree ¶ 12(b)(iii), there would be no "final decision" until the reexamination process was completed.

5. The Monitor's Report relies on terms which can be found in Policy Notice FLP–279 issued by USDA.

however, a claimant eventually succeeds in his or her claim, in some cases USDA will refund any money that was taken by the government by offset.

*See id.* at 3. The Court agrees that the Monitor's explanations of Paragraph 7 of the Consent Decree are an accurate and correct reading of the language and intent of the Decree.

Plaintiffs argue that they have filed these new lawsuits to challenge behavior that post-dates the Consent Decree in *Pigford.* Plaintiffs urge the Court to analyze their claims outside of the *Pigford* context. The debts against which these administrative offsets are being taken, however, are debts covered by the class period and thus by the Consent Decree. The Court cannot conclude that, even should plaintiffs prevail on new claims of discrimination in the context of these new lawsuits, such success would translate into forgiveness of the debts incurred during the *Pigford* class period. Plaintiffs' alternative request, that the administrative offsets be stopped during the pendency of their Monitor reviews, would require this Court to rewrite the Consent Decree to include provisions which do not appear to have been negotiated by the parties. This the Court cannot do. *See Pigford v. Veneman,* 292 F.3d 918, 925 (D.C.Cir.2002) (district court exceeded its jurisdiction by extending deadlines under consent decree because "the district court's interpretive and enforcement authority depends on the terms of the decree and related court order, rather than on some 'ancillary' or 'inherent' power").

Although the Court has sympathy for plaintiffs' plights, the Consent Decree does not require USDA to refrain from administrative offsets during the course of the *Pigford* claims process, and the governing statute requires that it administratively offset such debt. *See* 31 U.S.C. § 3711(g)(9) (use of the word "shall"). The Court cannot find, therefore, that plaintiffs have any likelihood of success on the merits, much less the substantial likelihood required for emergency injunctive relief.

### C. Irreparable Harm

Even if plaintiffs were likely to succeed on the merits, neither Mr. Bradshaw nor the Hildebrandts explain what specific immediate and irreparable harm they will suffer if their motions for injunctive relief are denied. Both stated that they "are on the verge of financial collapse." Counsel for plaintiffs represented in vague terms that denial of this relief will force plaintiffs to stop farming. No evidence of an immediate crisis, however, was provided. In the case of the Hildebrandts, although the Court understands that any amount of money is important to the plaintiffs, the Court cannot conclude that a potential administrative offset of $700 in the next six months rises to the level of "irreparable harm."

The Court acknowledges that the $16,000 offset involved in Mr. Bradshaw's case is a substantial sum of money. Given the extremely low likelihood of success on the merits, however, the Court cannot conclude that the harm asserted outweighs the remaining factors required for injunctive relief. The Court also must consider the fact that plaintiffs are not asking the Court to maintain the *status quo* by preventing the defendants from taking some action. Rather, they are asking the Court not only to require the defendants to pay the amount which would otherwise be administratively offset, but also to reimburse plaintiffs for administrative offsets previously taken. This hurried resolution in favor of plaintiffs is not the purpose of temporary or preliminary injunctive relief. *See Enercons Virginia, Inc. v. American Security Bank, N.A.,* 720 F.2d 28, 29

(D.C.Cir.1983) ("By ordering [defendant] to pay the disputed check, the district court did not simply preserve the status quo, but instead summarily resolved all conflicting claims to the check immediately after commencement of the action on short notice to the defendant."). Accordingly, it is hereby

ORDERED plaintiff's application for a temporary restraining order and temporary injunction [9] in Civil Action No. 04–1422 is DENIED; and it is

FURTHER ORDERED that plaintiffs' application for a temporary restraining order and temporary injunction [9] in Civil Action No. 04–1423 is DENIED.

SO ORDERED.