Judith A. STANLEY, v. Edgar Stanley, Robert Marcuccilli and Wayne Roe, Petitioners,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM,** Respondent.

No. 90–3183.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1991.

Decided Aug. 15, 1991.

Linda J. Peters, Sowers, Riebenack & Connolly, F. Walter Riebenack (argued), Fort Wayne, Ind., for petitioners.

Katherine H. Wheatley (argued), Washington, D.C., for respondent.

Before CUMMINGS, CUDAHY and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

Petitioners are four former Directors of Northwest Indiana Bancshares, Inc. ("Northwest"), a bank holding company in Fort Wayne, Indiana. They seek review of an order of the Board of Governors of the Federal Reserve System ("the Board") assessing a $15,000 civil money penalty apiece against Judith Stanley, Robert Marcuccilli and Wayne Roe and a $25,000 civil money penalty against Edgar Stanley. The Board also assessed penalties against three other former Directors who have not petitioned for review. These penalties were assessed pursuant to the Federal Deposit Insurance Act (12 U.S.C. §§ 1818(b)(3) and

1818(i)) and Section 8(b) of the Bank Holding Company Act (12 U.S.C. § 1847(b)).[1] We have jurisdiction to review these orders under 12 U.S.C. § 1818(i)(2)(A)(iv).[2] The Board entered its decision on September 7, 1990.

## I. *Background*

Northwest was subjected to regulation under the Bank Holding Company Act on account of its ownership of a subsidiary bank. During the time that the Board attempted to bring Northwest into compliance with regulation and law by way of a cease and desist order ("Order"), the condition of the subsidiary steadily deteriorated. The subsidiary finally failed on October 3, 1988, and at that time Northwest ceased to be a bank holding company subject to the Act. However, the Board became involved in the affairs of Northwest and its subsidiary several years earlier. Due to the poor financial condition of Northwest and its affiliates in late 1983, the Board issued the Order on February 13, 1984. The Directors of Northwest consented to the terms of the Order by signing and executing it. The Order prohibited Northwest from taking a number of actions without prior approval of the Federal Reserve Bank of Chicago ("the Reserve Bank"). For example, the Order prevented Northwest from undertaking particular actions without the approval of the Reserve Bank. These actions included increasing borrowings, incurring additional debt and engaging in transactions with affiliates.

In early 1988, a Reserve Bank inspection uncovered numerous deficiencies in compliance with the Order and violations of law. In conflict with the terms of the Order, Northwest:

1) incurred additional debt without first obtaining the approval of the Reserve Bank;

2) failed to provide the Reserve Bank with a plan for servicing current debt without incurring additional debt;

3) engaged in transactions with affiliates as prohibited by the Order and without first securing approval of the Board as mandated by the Bank Holding Company Act;

4) failed to comply with the Order's requirement that Northwest submit to the Board a proper tax allocation plan within 60 days of the issuance of the Order;

5) did not reimburse its subsidiary for overpayments by the subsidiary within the time period prescribed by the Order;

6) violated the Bank Holding Company Act and its implementing Regulation Y, then codified at 12 C.F.R. § 225.4, requiring that a bank holding company secure prior Board approval before engaging in any lending activities;

7) failed to obey the Order's command that Northwest adopt an affirmative compliance program and appoint a "responsible officer of the company" as compliance officer;

8) was in substantial non-compliance with the Order's requirement that Northwest submit quarterly reports documenting compliance with the Order, including cash receipts and disbursement reports, balance sheets, and income statements. Moreover, the fact that the information may have been available to the Board through other channels in no way excuses the failure to comply with the reporting requirements;

9) was party to violations of the Bank Holding Company Act when five out of

---

1. The Federal Deposit Insurance Act, 12 U.S.C. § 1818(b)(1) authorizes the Federal Reserve Board to issue a cease and desist order when "any insured depository institution * * * has engaged * * * in an unsafe or unsound practice in conducting the business of such depository institution * * *." Section (b)(3) extends the application of the provision to any bank holding company, and to any subsidiary of a bank holding company. 12 U.S.C. § 1818(i) provides for enforcement of the Act through the imposition of civil money penalties, as does the comple-

mentary section of the Bank Holding Company Act, 12 U.S.C. § 1847(b).

2. The Federal Deposit Insurance Act, 12 U.S.C. § 1818(i)(1) vests jurisdiction in the United States courts for enforcement of orders issued under the Act against any insured depository institution which "violates any written agreement [*i.e.* cease and desist order] between such depository institution and such agency." 12 U.S.C. § 1818(i)(2)(A)(iv).

seven Northwest directors failed to obtain the required prior Board approval for the acquisition of Northwest by Michiana, a related company.

Despite efforts of the Reserve Bank to bring Northwest into compliance with the Order, the violations persisted. The condition of Northwest's subsidiary continued to worsen, causing it to be closed by Indiana authorities on October 3, 1988, at which time Northwest ceased to be a bank holding company. However, before this time, the Directors of Northwest assumed responsibilities for enough separate violations of the Order and the Bank Holding Company Act to cover 69,000 days. Since the Act provides for the imposition of penalties up to $1,000 per day for each violation, the Board was empowered to assess a civil penalty of more than $50 million against each of the Directors.

On June 26, 1989, the Board issued a notice of assessment of civil money penalties against seven former Directors of Northwest, including the four petitioners, for violating the cease and desist Order and other laws and regulations, as noted above. While the Board calculated that it was entitled by law to impose penalties of $57,647,-000 against each of the Directors, it chose instead to reduce the penalties to $200,000 against each of five Directors, and $150,000 against each of the two remaining Directors (App. 197). Since the Directors contested the fines owed to the Government, an administrative law judge held a hearing from November 14 to 18, 1989, and issued his recommended decision on April 5, 1990, finding various violations of the Order and of applicable laws and regulations. Although he agreed with the Board that by statute he possessed the authority to assess against each of the Directors a civil money penalty in excess of $50 million, he recommended penalties of only $2,000 apiece for the seven former Directors. In assessing the penalties, the administrative law judge reduced the amounts because he apparently believed that the Directors' violations were "technical" in nature; that the Board's examiner lacked credibility; and that the Directors had acted according to "overwhelming good faith" (App. 30–31).

Because the Board found that the Directors had breached their obligation to adhere to the terms of the Order and to abide by the law, the Board increased the recommended penalties against the Directors in its decision of September 7, 1990. Four of the Directors adversely affected by this decision petitioned for review. We affirm the Board's final decision and Order.

## II. *The Board's Jurisdiction*

Petitioners first argue that the Board had no jurisdiction to assess any civil money penalties against them after Northwest ceased to be a bank holding company on October 3, 1988. Prior to its amendment in 1989, the Federal Deposit Insurance Act provided for the assessment of civil money penalties against any insured bank, including persons participating in the conduct of the affairs of a bank who violate a final cease and desist order. 12 U.S.C. § 1818(i)(2)(i) (1988). For purposes of this provision, a bank holding company is treated as an insured bank. 12 U.S.C. § 1818(b)(3) (1988). Petitioners argue that the Board lost its authority to impose penalties on the Directors, because the notice of assessment was served on June 26, 1989, months after they had ceased being directors in October 1988.

This Court previously rejected a director's attempt to escape liability under the Federal Deposit Insurance Act, 12 U.S.C. § 1818. In *Larimore v. Conover*, 775 F.2d 890, 896 (1985), reversed on other grounds, 789 F.2d 1244 (*en banc*) (7th Cir. 1986), we concluded that a director could be held responsible when "he was an active director of the bank when all of the violations occurred and * * * he was the person who actually made all the excessive loans." *Id.* at 896. Bank directors cannot be allowed to evade culpability for mismanagement or for the failure to adhere to the regulatory instructions of the Reserve Bank. The statute did not limit assessment of civil money penalties to current directors of banking organizations. Otherwise, all that a disobedient director would have to do to get off scot-free would be to mismanage the bank and resign before the

Board has a chance to assess civil money penalties.

■ In any event, any such question has been removed by the amendment to Section 1818 of the Federal Deposit Insurance Act included in the August 9, 1989, enactment of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). Congress provided for stricter procedures to enforce the statute regulating banks and thrifts in response to "a serious epidemic of financial institution insider abuse." H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 464 (1989), reprinted in 1989 U.S.Code Cong. & Admin.News 86, 260. Underlying Congressional concern was the realization that bank failures have been precipitated in large measure by "misconduct, fraud, and abuse." *Id.* The relevant amended section provides in part that:

> [t]he resignation, termination of employment or participation, or separation of an institution-affiliated party (*including a separation caused by the closing of an insured institution*) shall not affect the jurisdiction and authority of the appropriate Federal banking agency to issue any notice and proceed under this section against any such party, *if such notice is served before the end of the 6–year period* beginning on the date such party ceased to be such a party with respect to such depository institution (*whether such date occurs before, on, or after August 9, 1989*).

FIRREA § 905(a), 103 Stat. 459 (codified at 12 U.S.C.A. § 1818(i)(3)) (emphasis supplied). Here the notice of assessment of civil money penalties was served on the Directors in June 1989, which was about nine months after the subsidiary failed and therefore within the 6–year period provided for by FIRREA.

■ To avoid this amendment, petitioners argue that it was an *ex post facto* law forbidden by Article I, Section 9 of the Constitution, because the notice of assessment of the civil money penalties was served on them shortly prior to the FIRREA amendment. A law is deemed to be *ex post facto* in violation of the Constitution when it "punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed * * *." *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 quoting *Beazell v. Ohio,* 269 U.S. 167, 169–170, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (Stone, J.). However, when an amendment does not add to the penalties or deprive the aggrieved party of an available defense, the amendment is procedural in nature and is therefore not properly viewed as *ex post facto.*

The amendment to the FIRREA affects only the timing according to which the Board may initiate proceedings against a director, permitting it to proceed against a director even when the financial institution has closed or the director has resigned, so long as the Board initiates proceedings within a six-year period beginning when the director severs his ties with the institution. FIRREA § 905(a), 12 U.S.C. § 1818(i)(3). Because the amendment does not create a new offense and does not increase civil penalties for violations occurring before the amendment was enacted, Section 905(a) does not run afoul of the *ex post facto* clause. See H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 469 (1989), reprinted in 1989 U.S.Code Cong. & Admin.News 86, 265 (statement by the House Banking Committee that the section does not create a new offense and is procedural in nature). Consequently the Board had jurisdiction to assess the civil money penalties against petitioners after Northwest ceased to be a bank holding company without violating Article I, Section 9 of the Constitution. *Dobbert,* 432 U.S. at 292, 97 S.Ct. at 2297; *Dufresne v. Baer,* 744 F.2d 1543, 1546 & n. 10 (11th Cir.1984) (delineating the three characteristics of an *ex post facto* law: it is criminal or penal, retrospective and disadvantageous because it imposes a greater punishment), certiorari denied, 474 U.S. 817, 106 S.Ct. 61, 88 L.Ed.2d 49.

III. *The Board's Determination as to the Gravity of the Directors' Violations*

■ The Board agreed with the administrative law judge that petitioners violated

the Board's 1984 Order and the Bank Holding Company Act over many years. However, the administrative law judge concluded that the violations were technical, mostly outweighed by the Directors' good faith (*e.g.*, their substantial investment in Northwest of their own funds), so that only token penalties of $2,000 against each were justified. To the contrary, the Board concluded that the violations were not technical or minor and were not excusable by the Directors' good faith, thus justifying higher penalties than those recommended by the administrative law judge.

It is well settled that this Court defers to an agency board's factual interpretations rather than to the factual interpretations of the hearing examiner (in this case, the administrative law judge). *Glenroy Constr. Co. v. NLRB*, 527 F.2d 465, 467–468 (7th Cir.1975) (rejecting notion that "clearly erroneous" standard of Fed.R.Civ.P. 52(a) should apply to review of administrative law judge's findings of fact when it is the Board that possesses the responsibility for decision); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1076 (9th Cir.1977) (discussing application of substantial evidence standard when the agency review board and the administrative law judge disagree on the facts); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C.Cir.1970) (stating that "in the last analysis it is the agency's function, not the [administrative law judge's], to make the findings of fact and select the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs"), certiorari denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701. The appropriate standard of review prevents us from rejecting the factual findings of an agency when the findings are supported by substantial evidence. The Administrative Procedure Act sets forth the general proposition to be applied to agency review, 5 U.S.C. § 706(2)(E), and the Bank Holding Company Act applies that standard of review to judicial review of factual determinations by the Federal Reserve Board: "The findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive." 12 U.S.C.

§ 1848. See *Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 682 (D.C.Cir.1984); *Wyoming Bancorporation v. Board of Governors of Fed. Reserve Sys.*, 729 F.2d 687, 691 (10th Cir. 1984).

■ The Board thus acts within its discretion when it rejects the credibility findings of the administrative law judge where the Agency bases its decision on substantial evidence. See *NLRB v. Brooks Cameras, Inc.*, 691 F.2d 912, 918–919 (9th Cir. 1982) (upholding the agency's rejection of credibility findings when an inaccuracy engendered the erroneous finding of fact and reviewing court cannot say that agency erred in rejecting administrative law judge's findings); *Midwest Stock Exch., Inc. v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980) (Court [and agency] may disregard credibility determinations where they are found to be unreasonable, self-contradictory or based on inadequate reasoning).

Mixed in with the Board's disagreements with the administrative law judge over particular credibility determinations was its more fundamental disagreement with the administrative law judge over whether the violations were merely technical in nature and mitigated by good faith. The extent to which the Board determines that both of these conditions obtain determines the severity of the penalty to be imposed. As we recognized above, our review of the Board's decision is deferential. And it is deferential for a reason. The choice and severity of sanctions is "judgmental—an exercise of administrative discretion is entitled to judicial respect * * * and depends on particulars of the banking industry to which the generalist federal judiciary is not privy." *Central Nat'l Bank v. United States Dep't of Treasury*, 912 F.2d 897, 904–905 (7th. Cir.1990) (collecting cases). In a decision upholding the Comptroller of the Currency's prerogative to impose a harsher penalty upon a bank for unlawful activity than the punishment proposed by the administrative law judge, we went on to assert that the relevant discretion lay

with the Comptroller and not with the administrative law judge. *Id.*

It was up to the Board rather than the administrative law judge to determine how seriously to take the Directors' violations of its Order, thus determining their gravity and the extent to which the Directors acted in good faith. The Board explained its position that the Directors' many infractions with respect to the law regulating bank holding companies and the cease and desist order foreclosed the imposition of nominal money penalties. It viewed the violations more seriously than the administrative law judge:

> [W]hen a bank holding company is subject to a cease and desist order, its directors have an affirmative, personal obligation to see that the company complies fully with the order. A token penalty for the types of failures involved here would not adequately address the twin goals of civil money penalties of punishment and deterrence.
>
> \*     \*     \*     \*     \*     \*
>
> With respect to the statutory factors, the Board views violations of a cease and desist order as an extremely grave matter. \* \* \* [T]he violations of the Order and of the [Bank Holding Company] Act \* \* \* were long-term, recurring violations that continued after [the Directors] became aware of the violations. [The Directors'] failure to take affirmative steps to comply with the Order constitutes a failure to cooperate with the agency.

App. 31–32. There was substantial evidence in the record to support the Board's determinations, and it rationally explained its divergence from the administrative law judge's findings. *Abercrombie v. Clarke,* 920 F.2d 1351, 1361 (7th Cir.1990). The Board found that the violations of the Order and the Bank Holding Company Act persisted even after the Directors became aware of the violations and yet failed to undertake affirmative measures to comply with the Order. Additionally, the Board stated that despite Northwest's history of prior violations and resulting criticisms, it did not adopt a compliance program. Finally, the Board determined that Northwest's lending and borrowing practices were unsafe and unsound. Because the Board considered the violations of the Order and the Bank Holding Company Act to be "an extremely grave matter" rather than a technicality overlooked in good faith, we accord the Board the deference that it is due and uphold its findings.

### IV. *Amounts of Penalties*

■ Based on its view of the severity of the many violations by the Directors, the Board rejected as insufficient the administrative law judge's imposition of $2,000 penalties against each of the Directors. The Board instead increased the civil money penalty by imposing a $25,000 penalty on petitioner Stanley and $15,000 penalties on each of the remaining Director-petitioners. Because the administrative law judge simply makes recommendations to the Board, whose job it is then to adopt or reject the recommendations in the exercise of its discretion, *Central Nat'l Bank,* 912 F.2d at 904–905, the increased penalties were justified because the Board "determined that the gravity of the violations was more serious than had the ALJ," and that substantial evidence supported the penalties. *Abercrombie,* 920 F.2d at 1361.

The Board's above-quoted explanation of why it increased the token penalties recommended by the administrative law judge comports with its perception of the gravity of the violations (App. 30). Because the Board bears responsibility for monitoring the operation of this country's banks in compliance with the law, we respect the Board's expertise in identifying serious violations and determining the appropriate penalty. In this era of widespread bank failure and growing consumer uncertainty in the vitality of this country's financial institutions, the Board is uniquely positioned to fashion an appropriate response to the crisis—one that imposes penalties appropriate to the violation and severe enough to deter future mismanagement.

■ Even though the Board could have imposed penalties upwards of $50 million on each director (App. 197), it did not levy

its fines without considering the individual predicaments of each of the Directors as is required under the statute. Before assessing the amounts of the civil monetary penalties, the Board considered the size of the financial resources of the Directors as well as their asserted good faith (App. 33, 35) and therefore reduced the $200,000 penalties first assessed against each of the four petitioners and former Director DeHart (App. 96) to the $85,000 finally levied against them (App. 37). The Board's counsel introduced evidence regarding the financial resources of the Directors, and their more recent financial information was considered by the Board as a mitigating factor. The Directors contend, however, that the Board had to overcome a more substantial hurdle, one which required it to prove affirmatively the state of each Director's financial condition before imposing civil money penalties. They rely on two Ninth Circuit cases, *Bosma v. United States Dep't of Agric.*, 754 F.2d 804 (1984), and *Premex, Inc. v. Commodity Futures Trading Comm'n*, 785 F.2d 1403 (1986). In both cases, which also involved statutes requiring the agency to consider financial factors, the court remanded consideration of the amount of the penalty to the agency due to the respective agency's failure to produce evidence as to the appropriateness of the penalty. *Bosma*, 754 F.2d at 810; *Premex*, 785 F.2d at 1409. The Directors read these decisions to increase the burden on the Board, when neither decision effects so drastic an allocation of the burden of proof. The court remanded the determination of the penalty in *Bosma* and *Premex* because the Government did not bother in either case to produce any evidence as to the propriety of the penalty. The two cases simply impose a burden of producing evidence, not a one-sided burden of proof. *Bosma*, 754 F.2d at 810; *Premex*, 785 F.2d at 1409.

An awkward state of affairs would arise if the Board was required to bear full responsibility for proving the financial condition of the individual Directors who obviously oppose higher penalties and whose self-interest is served by painting as grim a picture as possible of their respective financial conditions. While the Board in the responsible exercise of its regulatory power should consider the solvency of the Directors, it is ill-positioned to sustain the full burden of proof concerning the financial condition of the Directors who must pay the penalty levied against them. As discussed above, in the instant case the Board considered the financial condition of the Directors in sufficient detail. Therefore, the final amount of the penalties assessed against petitioners will not be disturbed.

## V. *Conclusion*

FIRREA provides for the imposition of civil money penalties upon bank directors who fail to comply with the law or with the Reserve Bank's vigorous efforts to bring a financial institution into compliance through the enforcement of a cease and desist order. The Directors of Northwest do not dispute that the violations catalogued by the administrative law judge and the Board occurred. Rather, they contest the severity of the penalties imposed upon them. Our role, however, is not that of a regulatory agency, and we defer to the Federal Reserve Board, because it is in the best position to calculate appropriate penalties based on the gravity of the offense and the financial condition of the offender. Unlike this Court, which reviews cases involving enforcement of banking regulations only periodically, the Board specializes in this area of law enforcement. This is particularly true today as the Board, along with the other Government regulators of financial institutions, attempts to fashion an effective, consistent response to the widespread collapse of banks and thrifts in America today. Because our review of the Board's decision is deferential and because its decision amply rested on substantial evidence, the petition for review is denied and the Board's final decision and order are affirmed.