CITYFED FINANCIAL CORP.,
et al., Appellants,

v.

OFFICE OF THRIFT SUPERVISION,
United States Department of Treasury
and Jonathan L. Fiechter, Acting Di-
rector of the Office of Thrift Supervi-
sion, Appellees.

Nos. 94–5254, 94–5255.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 8, 1995.

Decided July 11, 1995.

Appeals from the United States District Court for the District of Columbia (No. 94cv01273).

Frank J. Eisenhart argued the cause, appellants. With him on the briefs for CityFed Financial Corp. were Arthur W. Leibold, Jr., Bettina L. Alexander and Neil R. Crowley.

Ronald W. Stevens and Douglas M. Kraus were on the briefs, for appellants Gordon E. Allen, et al.

Dirk S. Roberts, Asst. Chief Counsel, U.S. Dept. of Treasury, argued the cause, for appellees. With him on the brief were Carolyn B. Lieberman, Acting Chief Counsel, Thomas J. Segal, Deputy Chief Counsel, and Kerry W. Kircher, Sr. Trial Atty., U.S. Dept. of Treasury.

Before: EDWARDS, Chief Judge, ROGERS and TATEL, Circuit Judges.

Opinion of the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In June of 1994, the Office of Thrift Supervision issued a temporary cease and desist order against CityFed Financial Corporation that froze virtually all of CityFed's assets. According to OTS, the Corporation failed to use those assets to comply with the net worth requirements for its subsidiary bank, City Federal Savings and Loan, which OTS had placed into receivership several years earlier. Arguing that the receivership ended its control over its subsidiary and therefore OTS's jurisdiction over it as a "holding company," CityFed sought a preliminary injunction barring OTS from enforcing the temporary order. We agree with the district court that because the alleged violations occurred before the receivership, OTS had jurisdiction to issue the cease and desist order. Because CityFed failed to demonstrate that the temporary cease and desist order would cause it irreparable harm, we also affirm the district court's denial of the preliminary injunction.

I.

The savings and loan industry developed primarily as a means of "financ[ing] the purchase and construction of housing." *Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598, 601 (D.C.Cir.1992); *see also* H.R.Rep. No. 54, pt. 1, 101st Cong., 1st Sess. 291 (1989) [hereinafter House Report], *reprinted in* 1989 U.S.C.C.A.N. 86, 87. With the high interest rates of the late 1970s and early 1980s, savings and loans found themselves "locked into long-term, low-yielding, fixed-rate mortgages," while depositors transferred their assets from savings and loans into higher-yield investments. House Report at 295, U.S.C.C.A.N.1989, p. 91; *see Transohio*, 967 F.2d at 602. In an effort to address the resulting financial instability, the federal government significantly deregulated the savings and loan industry, allowing institutions to participate in much riskier investments. *See* House Report at 294–98. In combination with economic recession, poor management, and some fraud, failed high-risk investments "left the industry struggling for survival, and ... virtually wiped-out its deposit insurance fund." *Id.* at 292; *see also* S.Rep. No. 19, 101st Cong., 1st Sess. 7–10 (1989) [hereinafter Senate Report], U.S.C.C.A.N.1989, p. 88; *Transohio*, 967 F.2d at 601–04; *see generally* Graduate Colloquium 1990–91, *The S & L Crisis: Death and Transfiguration*, 59 Fordham L.Rev. S1, S1–S109 (1991).

In response to the lax regulation and loose capital requirements that it perceived at the root of the savings and loan crisis, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (codified at 12 U.S.C. § 1811 and in scattered sections of U.S.C.). In part, FIRREA was enacted to "establish stronger capital standards for thrifts," thereby providing "a cushion against losses incurred in times of poor financial

performance." House Report at 307, 310, U.S.C.C.A.N.1989, pp. 103, 106. According to Congress, "if a crisis of this nature is to be prevented from happening again, thrifts must be adequately capitalized against losses." *Id.* at 310, U.S.C.C.A.N.1989, p. 106; *see also Transohio,* 967 F.2d at 603–04. In addition to establishing these higher capital requirements, FIRREA was enacted to "enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste, and insider abuse." House Report at 307–08, U.S.C.C.A.N.1989, pp. 103–104. To increase the effectiveness of the regulatory scheme, Congress consolidated many of the powers and duties of the pre-FIRREA regulatory agencies, the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, into the newly-created Office of Thrift Supervision. *See American Fed'n of Gov't Employees v. FLRA,* 46 F.3d 73, 74 (D.C.Cir.1995); *Transohio,* 967 F.2d at 603; *see also* FIRREA, § 101(9), (10) (enacting FIRREA to "strengthen the enforcement powers of Federal regulators ... [and] the civil sanctions ... for defrauding or otherwise damaging depository institutions and their depositors").

Among OTS's powers is its ability to initiate administrative proceedings designed to protect savings and loans. *See* 12 U.S.C. § 1464(d)(1)(A) (Supp. V 1993) (giving OTS Director authority to enforce 12 U.S.C. § 1818). As authorized by 12 U.S.C. § 1818(b)(1) (Supp. V 1993), these proceedings may begin once OTS determines that "any insured depository institution ... or any institution-affiliated party is engaging or has engaged ... in an unsafe or unsound practice ... or is violating or has violated ... a law, rule, or regulation, or any condition imposed in writing by the agency." If one of these conditions exists "in the opinion of" OTS, it "may issue and serve upon ... such party a notice of charges." 12 U.S.C. § 1818(b)(1). After this notice and a hearing, the agency may issue a "permanent" cease and desist order that may require the party "to take affirmative action to correct the conditions resulting from any such violation," *id.,* including restitution in cases of "unjust enrichment" or "reckless disregard

for the law," 12 U.S.C. § 1818(b)(6) (Supp. V 1993).

In addition to its permanent cease and desist authority, OTS "may issue a temporary order requiring the depository institution or such party to cease and desist from any ... violation or practice [charged in a section 1818(b)(1) proceeding] and to take affirmative action ... pending the completion of such proceedings." 12 U.S.C. § 1818(c)(1) (Supp. V 1993). OTS can issue such orders, however, only if it

> determine[s] that the violation ... or the unsafe or unsound practice or practices, specified in the notice of charges served upon the depository institution or any institution-affiliated party pursuant to paragraph (1) of subsection (b) of this section, or the continuation thereof, is likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the [administrative] proceedings.

12 U.S.C. § 1818(c)(1).

To ensure that holding companies like CityFed do not escape OTS's regulatory authority, FIRREA made most of section 1818, including the permanent and the temporary cease and desist powers, applicable "to any savings and loan holding company ... in the same manner as such subsections apply to a savings association." 12 U.S.C. § 1818(b)(9). Under the statute, a "savings and loan holding company" is "any company which directly or indirectly controls a savings association or controls any other company which is a savings and loan holding company." 12 U.S.C. § 1467a(a)(1)(D) (Supp. V 1993).

To prevent regulated parties from interfering with the comprehensive powers of the federal banking regulatory agencies, Congress severely limited the jurisdiction of courts to review ongoing administrative proceedings brought by banking agencies. Thus, with respect to actions under section 1818, section 1818(i)(1) provides that, "except as otherwise provided in this section ... no court shall have jurisdiction to affect by in-

junction or otherwise the issuance or enforcement of any notice or order under [this] section, or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. § 1818(i)(1) (Supp. V 1993). Temporary cease and desist orders, however, are reviewable. Section 1818(c)(2) allows subjects of temporary cease and desist orders under section 1818(c)(1) to apply, within ten days, to their home federal judicial district or to the United States District Court for the District of Columbia "for an inju[n]ction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order pending the completion of the administrative proceedings . . . and such court shall have jurisdiction to issue such injunction." 12 U.S.C. § 1818(c)(2). It is under this provision that CityFed, the subject of an OTS enforcement proceeding, initiated this litigation in the district court.

CityFed began operating in 1984 as a savings and loan holding company with control over City Federal Savings Bank. As required by the Federal Home Loan Bank Board, the federal regulatory agency at the time, CityFed signed a net worth maintenance stipulation agreeing to "cause the net worth of City Federal to be maintained at a level consistent with that required by . . . the Rules and Regulations for the Federal Savings and Loan Insurance Corporation, as now or hereafter in effect, . . . and, as necessary, [to] infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement." Stipulation of CityFed Financial Corp. (Dec. 4, 1984), *in* Joint Appendix at 30.

Like so many other savings and loans, City Federal's financial position deteriorated in the late 1980s. In a disclosure statement filed with the Securities and Exchange Commission in late 1989, CityFed estimated that City Federal was approximately $118 million short of its regulatory capital requirements. The Office of Thrift Supervision, which by then had succeeded the Federal Home Loan Bank Board, sent CityFed a letter on December 6, 1989, demanding that CityFed comply with its net worth maintenance stipulation by infusing as much capital into City

Federal as possible. The next day, OTS appointed the Resolution Trust Corporation as receiver for City Federal. Although City-Fed took some steps to aid City Federal's financial status, such as hiring consultants, it declined to infuse any of its approximately $12.9 million in assets into City Federal, arguing that its funds would make no significant difference given the magnitude of the shortfall.

Exercising its authority under 12 U.S.C. § 1818(b)(1), OTS initiated administrative enforcement proceedings against CityFed in June of 1994. In these proceedings, which are still pending before the agency, OTS alleged, among other regulatory violations, that CityFed had failed to comply with the net worth maintenance stipulation it had signed ten years earlier. OTS sought over $2 million in civil penalties from CityFed as well as restitution of the $118 million shortfall. As authorized by 12 U.S.C. § 1818(c)(1), OTS also issued a temporary cease and desist order that placed severe restrictions on CityFed's use of its assets. This order was a direct response to the fact that from 1989 to 1994, CityFed's assets fell from $12.9 million to less than $9 million, at least in part because of substantial legal fees that CityFed was paying for the defense of it and its directors. To prevent further dissipation of funds that OTS alleges should have been paid into City Federal, the temporary order required CityFed to post security for its assets and limited CityFed's monthly expenditures to $15,000. As a result of this asset freeze, CityFed was unable to pay the legal fees of its directors.

Along with its directors, who intervened in the suit, CityFed sued OTS, asking the district court to enjoin the agency from enforcing the temporary cease and desist order. The district court refused to issue an injunction against OTS. CityFed appeals, making three arguments. It claims, first, that because City Federal effectively ceased to exist when it went into receivership in 1989, City-Fed no longer qualifies as a savings and loan holding company under the statute, thus depriving OTS of jurisdiction to impose a temporary cease and desist order on it. Second, asserting that its assets have not belonged,

and do not now belong, to a "depository institution," CityFed argues that its activities are not, as required by the temporary cease and desist statute, "likely to cause ... significant dissipation of assets or earnings of the depository institution." 12 U.S.C. § 1818(c)(1). Focusing on its allegation that it is likely to succeed on the merits in the underlying administrative proceeding, it argues finally that it has satisfied the conditions justifying a preliminary injunction.

## II.

█ CityFed does not dispute that it was a savings and loan holding company until December 7, 1989, when City Federal was placed into receivership. Nor does it deny that OTS would have jurisdiction over it if the agency had served a temporary cease and desist order before that date. The company claims that once OTS acted to protect the interests of City Federal's depositors by putting the institution into receivership, OTS lost its authority to bring administrative proceedings against CityFed.

█ CityFed's argument, of course, goes beyond a challenge to OTS's jurisdiction in the temporary cease and desist proceedings since OTS's authority to issue the temporary order under section 1818(c)(1) explicitly depends upon its jurisdiction in a "permanent" section 1818(b)(1) cease and desist proceeding. See 12 U.S.C. § 1818(c)(1). Thus, although section 1818(i)(1) prevents us from actually reviewing OTS's jurisdiction in the underlying permanent cease and desist proceedings, see 12 U.S.C. § 1818(i)(1), we can address CityFed's claims regarding OTS' jurisdiction to issue the temporary order only by examining, as do the parties, OTS's jurisdiction in actions brought under both subsections 1818(b)(1) and (c)(1).

Our examination of CityFed's jurisdictional argument begins, and largely ends, with the plain language of those subsections. Both authorize the OTS to initiate administrative proceedings and issue a cease and desist order against a "party." 12 U.S.C. § 1818(b)(1) & (c)(1). A "party," according to the statute, includes a holding company that "has engaged" in an unsafe practice or that "has violated" any conditions imposed on

it by law. 12 U.S.C. § 1818(b)(1). In this case, CityFed is a "party" that, as a holding company subject to regulation, allegedly violated the terms of its net worth maintenance agreement with the government. Accordingly, OTS "may issue and serve upon ... such party a notice of charges" and may initiate enforcement proceedings. 12 U.S.C. § 1818(b)(1). Because OTS had the authority to bring the subsection (b)(1) proceedings against CityFed, and because OTS determined that CityFed's violation is likely to cause "significant dissipation of assets" that properly belong to City Federal, subsection (c)(1) authorizes OTS to "issue a temporary order requiring ... such party"—i.e., City-Fed—"to cease and desist." 12 U.S.C. § 1818(c)(1). The statute's plain language, therefore, gives OTS jurisdiction over City-Fed.

█ CityFed argues that this language is insufficient, by itself, to give OTS continuing jurisdiction over a former holding company. It points to section 1818(i)(3), which explicitly gives banking agencies jurisdiction over individuals—"institution-affiliated parties"—for up to six years after they end their association with an institution. See 12 U.S.C. § 1818(i)(3). According to CityFed, this section proves both that Congress knows how to enact continuing jurisdiction authority if it chooses, and that it did not choose to grant such authority over holding companies. We disagree.

Congress included section 1818(i)(3) in FIRREA solely to address the effects of our decision in *Stoddard v. Board of Governors*, 868 F.2d 1308 (D.C.Cir.1989). *See, e.g.,* House Report at 468–69; Senate Report at 377–78 (discussing Senate predecessor of section 1818(i)(3)). In that case, the Office of the Comptroller of the Currency served Stoddard, a former officer of a savings and loan, with "a notice of its intent to remove him from office" under a banking enforcement statute similar to the present section 1818(b)(1). 868 F.2d at 1310. The only problem was that Stoddard had resigned his position a year before he received the notice. Concluding that "[o]ne cannot remove what isn't there," and that the agency's construc-

tion "presents a linguistic (and metaphysical) impossibility," we concluded that the agency could not issue a notice removing from office an officer that had already resigned. *Id.*

The banking agencies and Congress were concerned about the implications of *Stoddard* because the "removal" provisions that *Stoddard* limited were the means by which banking agencies barred individuals not only from association with a particular institution, but from *all* future association with the banking industry. *See* 12 U.S.C. § 1818(j) (1988) (barring individuals subject to removal orders from future association with the industry). To reinvigorate this method of protecting savings and loan customers from former officers, Congress enacted section 1818(i)(3). As reports by both houses of Congress and the conference committee make clear, section 1818(i)(3) was not intended to create a new cause of action, but rather to address the statutory ambiguity that *Stoddard* highlighted and the regulatory gap that it created. *See* House Report at 393, 468–69; Senate Report at 377–78; H.R.Conf.Rep. 222, 101st Cong., 1st Sess. 440 (1989).

Congress did not need to add similar continuing jurisdiction language to FIRREA regarding "former" holding companies because the statutory language simply did not present similar ambiguities for such parties, let alone the "metaphysical" difficulties that we perceived in *Stoddard.* 868 F.2d at 1310. Unlike that case, in which the agency's enforcement authority over former officers rested on its ability to remove from office someone who was no longer in office, OTS's authority over CityFed depends only on whether CityFed is the "party" that was a holding company at the time that it allegedly violated its agreements. *See* 12 U.S.C. § 1818(b)(1) & (c)(1). Even if CityFed is no longer a holding company, it is indisputably the same "party" that allegedly violated the stipulation. Because jurisdiction over CityFed or other former holding companies presents no "linguistic impossibility" in reading the statute, 868 F.2d at 1310, the absence of explicit authority for continuing jurisdiction over such parties, upon which CityFed places so much reliance, implies nothing.

Our conclusion that OTS has jurisdiction over CityFed finds support in the policies articulated in several factually different yet conceptually similar cases that the parties debate in their briefs. *See, e.g., Akin v. OTS,* 950 F.2d 1180, 1185 (5th Cir.1992); *Stanley v. Board of Governors,* 940 F.2d 267, 270–71 (7th Cir.1991); *Anaya v. Federal Home Loan Bank Board,* 839 F.2d 1349, 1350–51 (9th Cir.1988); *Larimore v. Conover,* 775 F.2d 890, 896 (7th Cir.1985), *rev'd on other grounds,* 789 F.2d 1244 (7th Cir.1986) (en banc), *superseded by statute,* FIRREA § 902 (codified at 12 U.S.C. §§ 1786 & 1818); *Paul v. OTS,* 763 F.Supp. 568, 573 (S.D.Fla. 1990), *aff'd sub nom. Paul v. Ryan,* 948 F.2d 1297 (11th Cir.1991) (table). In each of these cases, former officers of failed savings institutions challenged banking agencies' jurisdiction over them, and in each case, the court rejected the challenge because it conflicted with the intent behind as well as the language of the banking enforcement statutes. Echoing the logic of earlier cases, the Fifth Circuit observed that the officer's interpretation "would allow an institution and its individual officers to ignore regulations, statutes and agreements and commit flagrant violations, and yet retain immunity from cease and desist actions if the violations were sufficiently severe to warrant prompt imposition of receivership. This interpretation belies congressional intent expressed to adopt broader cease and desist powers with the passage of FIRREA." *Akin,* 950 F.2d at 1185; *see also Stanley,* 940 F.2d at 270–71; *Larimore,* 775 F.2d at 896.

It is true, as CityFed points out, that the post-FIRREA decisions rely at least in part on the language in section 1818(i)(3), which gave banking agencies continuing jurisdiction over institution-affiliated parties. *See, e.g., Akin,* 950 F.2d at 1185. It is also true that the officer in *Larimore* received the notice before he resigned, 775 F.2d at 896, a situation in which CityFed admits that OTS would have jurisdiction. We do not think, however, that these distinctions influenced the policy rationales articulated in those decisions. Instead, each rationale rested primarily on a

common understanding, shared by us, that FIRREA and its predecessor statutes were intended to protect savings and loans and their customers, not those whose management practices risked the well-being of the institutions. The policies articulated in those decisions are thus entirely applicable here.

As in the decisions from the Fifth, Seventh, and Ninth Circuits, our plain reading of subsections 1818(b)(1) and (c)(1) comports rather than conflicts with our understanding of statutory purpose. *Compare Stoddard,* 868 F.2d at 1311 (rejecting appeal to "congressional purpose" because it could not "be reconciled with the language of the statute"). CityFed's theory would allow holding companies to get off "scot-free" if they act carelessly enough to force OTS to appoint a receiver. *Stanley,* 940 F.2d at 270. Neither language nor purpose compels us to create such an incomprehensible loophole in FIRREA's comprehensive regulatory scheme.

Claiming that the agency has alternative ways to accomplish its objectives with respect to former holding companies, CityFed argues that it would not necessarily escape all liability were we to adopt its interpretation of the statute. Its proposed alternatives, however, do not offer a practical substitute for OTS's cease and desist authority. For example, it argues that the "Federal banking agency that succeeded to the government's rights under the net worth maintenance stipulation ... could have brought [a contract] action against CityFed for the alleged violation of that stipulation." CityFed Brief at 19 n. 18. Yet in the same breath, CityFed undermines its own assertion that this method would be a plausible enforcement alternative by arguing that "there is [a] substantial question" regarding whether the stipulation could be enforced as a contract. *Id.* at 31 n. 23. CityFed further claims that OTS could always protect its jurisdiction by initiating enforcement proceedings *before* it places an institution into receivership. This presumes, of course, that OTS has the time to conduct the investigation that must precede the filing of administrative claims. If, as is likely, the institution's financial status is deteriorating, OTS has little choice but to place it into receivership. It makes no sense

that Congress would have required the agency to choose between risking the financial well-being of the institution and using FIRREA's carefully-considered statutory enforcement process to recover from those responsible for the institution's downfall.

### III.

██ As a basis for its issuance of the temporary cease and desist order, OTS concluded that CityFed was "likely to cause ... significant dissipation of assets or earnings of the depository institution." 12 U.S.C. § 1818(c)(1). CityFed argues that this is impossible because its assets have never belonged to City Federal. According to OTS, however, CityFed improperly refused to use its available assets to support the net worth of City Federal, and so at least for purposes of the temporary cease and desist order, we should consider those funds to be assets "of the depository institution." We agree with OTS. CityFed—or any other owner of assets that allegedly should have been paid into a now-defunct savings institution—is hardly in a position to argue that it can spend those assets with impunity when the institution's downfall may have resulted, at least in part, from its retention or accumulation of those assets.

The cases that discuss dissipation under section 1818 find no significance in the fact that assets belong not to the institution, but to a party that has allegedly done it wrong. *See, e.g., Parker v. Ryan,* 959 F.2d 579 (5th Cir.1992) (upholding temporary cease and desist order to prevent dissipation of former officer's assets); *Spiegel v. Ryan,* 946 F.2d 1435, 1438 (9th Cir.1991) ("[R]estitution may not only compensate an institution for past wrongs, but may also serve to prevent the dissipation of assets *that may belong to it,* and thereby prevent prejudice to its depositors." (emphasis added)), *cert. denied,* 503 U.S. 970, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992). According to CityFed, these cases are distinguishable because the targeted party was alleged to have defrauded the institution, so there were at least allegations that the party's assets had, at one time, belonged to the institution. The critical allegation in those cases, however, was not fraud, but the

claim that the targeted party owned assets that allegedly should have been in the hands of the depository institution. *See, e.g., Parker,* 959 F.2d at 583 n. 4 (noting that the bulk of OTS's allegations underlying a temporary order were based on the exercise of "poor business judgment" and the improper allocation of dividends to third parties, not fraud). That is exactly what OTS has alleged here. As in *Spiegel* and *Parker,* then, the temporary cease and desist order in this case properly issued on the basis of OTS's allegations that CityFed was dissipating assets to which City Federal may legally have been entitled.

■ Citing Webster's New Collegiate Dictionary, CityFed also argues that dissipation implies "waste," and that no dissipation has occurred because its expenditures were reasonable. Webster's, however, also defines dissipate as "to lose ... irrecoverably" and "to spread ... thin to the point of vanishing." Webster's New Collegiate Dictionary 331 (1973). None of these definitions requires that the spreading be wasteful. Because OTS reasonably believes that CityFed possesses assets that properly belong to City Federal, CityFed's unmonitored spending "is likely to cause ... significant dissipation of assets" of City Federal. The temporary cease and desist order was thus proper, although we express no view on whether OTS will ultimately be able to order CityFed to make restitution of those funds in light of its failure to comply with the net worth maintenance agreement. *See Rapaport v. OTS,* 59 F.3d 212 (D.C.Cir.1995) (discussing standards for finding "unjust enrichment").

## IV.

■ We turn finally to CityFed's argument that the district court erred in failing to grant a preliminary injunction against the temporary cease and desist order. To prevail, CityFed must demonstrate 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction. *See Sea Containers Ltd. v. Stena AB,* 890

F.2d 1205, 1208 (D.C.Cir.1989). We review a district court decision regarding a preliminary injunction for abuse of discretion, and any underlying legal conclusions *de novo. See id.* at 1208–09; *Transohio,* 967 F.2d at 614. In denying the preliminary injunction, the district court concluded that CityFed had not demonstrated irreparable injury, and we agree.

The company has articulated at least three different theories of irreparable injury. In its initial brief in this court, the company asserted that OTS's lack of enforcement authority amounted to *per se* irreparable injury. In the district court, CityFed claimed that it risked bankruptcy, and its directors claimed that they are unable to afford defenses to the legal proceedings to which they are parties. Finally, CityFed argues in its reply brief that the Third Circuit has required it to pay the legal fees of former directors of its former subsidiary, which it cannot do under the OTS order.

Our conclusion that OTS had authority to issue the temporary order disposes of CityFed's first claim of irreparable injury. Its second is equally unpersuasive. As the district court pointed out, CityFed is not truly threatened with bankruptcy. OTS's temporary cease and desist order allows the company to spend a certain amount of its assets each month to meet expenses, and it also permits the company to request "hardship" relief from the requirements of the order, an exception that CityFed has yet to invoke. As for the individual directors, the district court concluded that they have sufficient personal assets to meet their legal needs. *CityFed Financial Corp. v. OTS,* No. 94cv1273, at 4 (D.D.C. Sept. 8, 1994) (denying motion for preliminary injunction). If a director's personal assets are not enough, the order's "hardship" provision offers one way that CityFed can provide additional funds. Also, according to the district court, OTS has agreed to allow CityFed to advance fees to the directors as long as they agree to return the fees should CityFed lose in the administrative proceeding. The directors have rejected this offer. *See id.* at 4–5. With respect to the Third Circuit order, *see Ridder v. CityFed,* 47 F.3d 85 (3rd Cir.1995), the

"hardship" provision again provides a possible means for CityFed to comply with both that order and OTS's requirements. Even if OTS refuses to grant CityFed's "hardship" request, the company could still petition the Third Circuit for a stay pending the resolution of OTS's cease and desist proceedings. At the very least, the request would present the Third Circuit with a new issue because its decision—which was based on a state law interpretation of the indemnity agreement that CityFed has with those officers—did not consider the OTS order. Because CityFed has not pursued these alternatives, we conclude that the district court was correct in finding that CityFed has not demonstrated irreparable injury.

 In deciding whether to grant an injunction, the district court must balance the strengths of the requesting party's arguments in each of the four required areas. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak. An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury. *See Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir.1986) (appendix, reprinting per curiam order granting motion for injunction pending appeal). Despite this flexibility, we require the moving party to demonstrate at least "some injury," *id.; see, e.g., Sea Containers*, 890 F.2d at 1210–11 (upholding district court decision denying request for preliminary injunction where moving party may have been "likely to succeed" but did not carry burden of showing irreparable harm), since " '[t]he basis of injunctive relief in the federal courts has always been irreparable harm.' " *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)). Because CityFed has made no showing of irreparable injury here, that alone is sufficient for us to conclude that the district court did not abuse its discretion by rejecting CityFed's request. We thus need not reach the district court's consideration of the remaining factors relevant to the issuance of a preliminary injunction.

## V.

In the world of savings and loan regulation envisioned by CityFed, a bank holding company that takes on net worth maintenance obligations has an incentive to act as recklessly as possible in order to build up its own assets while so injuring the stability of its subsidiary institution that federal banking agencies have no choice but to place it into receivership. Once in receivership, the holding company could freely use "its" assets as it saw fit, leaving nothing but the depleted assets of the subsidiary institution for the federal government and taxpayers to pick through in search of compensation for the holding company's reckless behavior. Because such a vision is contrary to the language and purposes of FIRREA, we reject it and affirm the decision of the district court. OTS had jurisdiction over CityFed and statutory authority to issue the temporary cease and desist order against it, and the district court did not abuse its discretion in concluding that CityFed had not met the prerequisites for a preliminary injunction.

*So ordered.*