**NATIONAL CONFERENCE ON MINISTRY TO THE ARMED FORCES D/B/A Ministry to the Armed Forces and Veterans Affairs Chaplaincy, Plaintiff,**

v.

**Kay Coles JAMES, Defendant.**

**Civil Action No. 03–1741(RBW).**

United States District Court,
District of Columbia.

Aug. 27, 2003.

David R. Hazelton, Latham & Watkins, Washington, DC, for the Plaintiff.

William M. Nebeker, Assistant United States Attorney, Washington, DC, for the Defendant.

## MEMORANDUM OPINION

WALTON, District Judge.

Currently before the Court is the Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [# 3]. For the reasons set forth below, plaintiff's motion is denied.

### I. Factual Background[1]

The Combined Federal Campaign ("CFC")[2] is a nationally operated campaign that solicits charitable contributions from "federal civilian employees, postal employees, and uniformed service person-

nel ... via voluntary payroll deductions and otherwise...." Compl. ¶ 7.[3] The CFC is the sole authorized means by which charitable organizations may solicit federal employees for contributions. 5 C.F.R. § 950.102. It is overseen by the Director of the Office of Personnel Management ("OPM"), who is responsible for "determin[ing] which organizations among those that apply qualify to be part of the national list ..." that employees utilize in determining to which organizations they want to make donations.[4] Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Pl.'s Mem.") at 2; 5 C.F.R. § 950.201(c).

Plaintiff, the National Conference on Ministry to the Armed Forces ("NCMAF"), is a non-profit Virginia corporation, which describes itself as "a unique and diverse association of over 250 religious faith groups and denominations that recruits, endorses and counsels American clergy persons to serve as Army, Air Force, Navy, Marines, or Coast Guard chaplains and VA hospital chaplains...." Compl. ¶¶ 4–5. NCMAF performs charitable work by providing "professional pastoral guidance and support to military and VA chaplains located in the United States

---

1. The parties appeared before the Court on August 20, 2003, for an initial hearing on the plaintiff's motion. At that time, the Court encouraged the parties to attempt to settle this matter. However, on August 22, the parties re-appeared before the Court to report that no settlement could be reached. At that time, the Court scheduled this matter for oral arguments for August 26, however, both parties agreed that if after the Court reviewed their papers it concluded that it could resolve this matter without oral arguments, they did not oppose the hearing being cancelled. Accordingly, the hearing was cancelled.

2. For a more detailed history of the CFC, *see* *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 790–92, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

3. References to "Compl." are to plaintiff's Complaint for Declaratory and Injunctive Relief filed on August 15, 2003.

4. The CFC is administered at both the national and local levels. The Director of OPM designates Local Federal Coordinating Committees ("LFCCs") to conduct and supervise local CFC efforts throughout the United States. Pl.'s Mem. at 2. A national list is then provided to all local campaigns, which is reproduced in all local brochures. 5 C.F.R. § 950.201(b). "An organization on the national list may elect to be removed from [that] list and have its local affiliate or subunit listed on the local list of organizations in its stead." *Id.* § 950.201(c).

and at military installations around the world." *Id.* Specifically, it, *inter alia,* recruits and provides training for military chaplains and conducts activities related to the delivery of faith based services to members of the military community. *Id.,* Ex. A (2003 National Organization Universal Application Form, Attachment A at 1–2). NCMAF is a member in good standing of the Military, Veterans & Patriotic Service Organizations of America ("MVP"), a national federation. *Id.* ¶ 6.[5] Pursuant to 5 C.F.R. § 950.301(c), once an organization has been accorded federation status, it need not annually submit the applications of each of its member organizations to OPM for participation in the CFC. However, for 2003, "OPM requested that MVP send to it for auditing complete applications for a sample of eight of the MVP organizations. The application for NCMAF was among those requested." Defendant's Memorandum in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Def.'s Opp'n") at 7. As required by 5 C.F.R. § 950.202, plaintiff included with its application 'Attachment A,' wherein it described those activities that "it provides or conducts ... in 15 or more different states...." Compl. ¶ 11. MVP submitted its list of eligible member organizations for participation in the 2003 CFC on January 27, 2003. *Id.* ¶ 12.

On April 10, 2003, the president of MVP, Linda Mansfield, received a letter from Mara Patermaster, Director of OPM's Office of CFC Operations, informing her that NCMAF had been denied participation in the CFC because

Attachment A of [its] application ... did not include sufficient information to support a claim that the organization provided or conducted real services, benefits, assistance or program activities in 15 or more different states or a foreign country over the three-year period immediately preceding January 2003. A clear showing must be made of the actual services, benefits, assistance or activities provided in each state or foreign country. Providing only the location of where organization members reside does not constitute a sufficiently clear showing to support eligibility.

Compl., Ex. B (Letter to Linda Mansfield from Mara Patermaster dated April 10, 2003). On April 28, 2003, Ms. Mansfield appealed the denial of NCMAF's application to participate in the 2003 CFC, which was denied in a letter dated June 19, 2003, by OPM's Deputy Director, Dan G. Blair. *Id.* ¶ 14; *see also* Compl., Ex. D (Letter to Linda Mansfield from Dan G. Blair dated June 19, 2003). Mr. Blair justified sustaining the decision denying NCMAF's application because NCMAF's Attachment A was not sufficient:

The purpose of Attachment A of the CFC application is to *clearly* identify national and/or international services, benefits, assistance or program activities in 15 or more states or one foreign country. It is our view that the organization did not do so.

*Id.* (emphasis in the original).

On June 30, 2003, NCMAF sent a letter to OPM, requesting that the June 19 decision be reconsidered. Compl. ¶ 16. Several days later, NCMAF's attorney

---

**5.** Pursuant to 5 C.F.R. § 950.301(a), "[t]he Director may recognize national federations that conform to the requirements and are eligible to receive designations." These federations must contain "15 or more charitable organizations that meet the eligibility criteria of § 950.202 and § 950.203." *Id.* § 950.301(c). Initially, when "an organization applies for federation status, it must submit the applications of all its proposed member organizations...." *Id.*

contacted OPM's general counsel, Mark Robbins, to indicate that NCMAF would be willing to provide any additional information needed by OPM for inclusion in the 2003 CFC. *Id.* Mr. Robbins allegedly[6] agreed that NCMAF could submit additional materials regarding the services it provides, which would allow OPM to reconsider it for participation as a 2003 CFC charity. *Id.* NCMAF was purportedly told it would have to submit any additional information for consideration "immediately." *Id.* ¶ 17. The next day, NCMAF submitted additional information, which it believes "unequivocally demonstrated that NCMAF met the requirements to participate in the 2003 CFC." *Id.* On July 23, 2003, in response to NCMAF's attorney's inquiry, Mr. Robbins allegedly stated that the additional information submitted by NCMAF would be reviewed by the CFC Appeals Board on Thursday, July 24, 2003. *Id.* However, despite these alleged assurances from Mr. Robbins, on July 28, 2003, Susan Whitman, a staff attorney at OPM, informed NCMAF's attorney that "OPM had decided that NCMAF would not be allowed to participate in the 2003 CFC." *Id.* ¶ 18. Contrary to what plaintiff claims Mr. Robbins represented, Ms. Whitman did not confirm nor deny whether the additional materials submitted by NCMAF had been reviewed by the CFC Appeals Board; she merely reiterated that OPM had decided to adhere to its June 19, 2003, determination. *Id.* Thereafter, NCMAF contacted Ms. Patermaster re-

garding OPM's decision. *Id.* Ms. Patermaster apologized for NCMAF having been led to believe that its additional materials would be reviewed. Nonetheless, she "claimed that OPM's final decision with respect to NCMAF's application was necessary to protect the integrity of the CFC review process[,]" although, "in her view, the additional information submitted by NCMAF on July 17, 2003, met the CFC requirements." *Id.*

OPM posted the 2003 National List of Participating Agencies on the OPM website on or about July 31, 2003. *Id.* ¶ 20. After July 31, 2003, local combined federal campaigns began printing brochures for the 2003 CFC to distribute to federal employees on or after September 1, 2003. *Id.* On July 15, 2003, prior to posting the list of participating agencies, three other organizations that had been denied participation in the 2003 CFC, "the National Greyhound Foundation, Inc., Vegan Outreach and Missionary Care Services International, brought suit separately against OPM." *Id.* ¶ 19. These organizations had been denied participation, according to plaintiff, on the basis that they "failed to include sufficient information to support a claim that [they] provided or conducted real services, benefits, assistance or program activities in 15 or more different states as required by 5 CFR § 950.202." *Id.* Each of these cases was settled, which resulted in each of these organizations being permitted to participate in the 2003 CFC. *Id.* Plaintiff alleges that OPM failed

**6.** Plaintiff has included two typewritten voicemail transcriptions of messages allegedly left by Mr. Robbins on plaintiff's counsel's voicemail. *See* Compl., Exs. E & F; Pl.'s Mem., Exs. D & F. However, there is no way to verify the authenticity of the voicemails or the accuracy of the transcriptions; furthermore, an affidavit or declaration of the person who transcribed the voicemail attesting to the fact that the voicemails were transcribed verbatim

has not been presented by plaintiff. However, in his declaration, Mr. Robbins appears to concede that he made the representations to plaintiff regarding the consideration of the additional materials plaintiff sought to submit, although he claims he did so under the mistaken impression that plaintiff's appeal was still pending. *See* Def.'s Opp'n, Ex. 10 (Declaration of Mark Robbins dated August 19, 2003) ("Robbins' Decl.") ¶¶ 7–10.

to address why these organizations were ultimately permitted to participate in the 2003 CFC and NCMAF was not. *Id.*

On August 15, 2003, NCMAF filed its complaint for declaratory and injunctive relief and its motion for a temporary restraining order and preliminary injunction. Plaintiff argues that OPM's exclusion of NCMAF from the 2003 CFC was arbitrary and capricious and in violation of NCMAF's First Amendment rights. Pl.'s Motion for a Temporary Restraining Order and Preliminary Injunction ("Pl.'s Mot.") at 2. Plaintiff seeks a temporary restraining order ("TRO") "preventing defendant from excluding NCMAF from the 2003 CFC pending a hearing on the merits by this court[.]" *Id.* ¶ 25(A). In addition, plaintiff seeks a preliminary, as well as a permanent "injunction in the nature of mandamus, requiring defendant to include NCMAF in the 2003 CFC," as well as a declaratory judgment declaring that the defendant erred in denying NCMAF's ap-

plication to participate in the 2003 CFC. *Id.* ¶¶ 25(B)-(D).

## II. Discussion

■ The Court must apply the standard four-part test in determining whether or not to grant plaintiff the injunctive relief it is requesting. This test requires the Court to weigh four factors: (1) whether the moving party has demonstrated that there is a substantial likelihood that it will prevail on the merits of its claims; (2) whether the moving party has shown that it would be irreparably harmed if injunctive relief is not awarded; (3) whether the issuance of injunctive relief would not "substantially harm other parties interested in the proceedings," and (4) whether awarding the relief is in the public interest. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977) (citing *Virginia Petroleum Jobbers Assoc. v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958)).[7] These factors

---

7. Plaintiff argues that it is "not required to prevail on each [of the four factors necessary for a grant of injunctive relief]." Pl's. Mem. at 6. Rather, plaintiff argues that under this Circuit's precedent, "these factors must be viewed as a continuum, with the presence of more than one factor compensating for less of another." *Id.* at 6 (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995)). Judge Urbina noted that "the D.C. Circuit seems to have set forth two lines of precedent that do not entirely overlap." *Adair v. England*, 217 F.Supp.2d 1, 3 n. 7 (D.D.C.2002). He pointed out that in one line of cases, *see, e.g., Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C.Cir.1998), the court indicated that "a litigant must show" all four factors before injunctive relief is warranted. And, he noted that in *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356 (D.C.Cir.1999), the court of appeals did not indicate that a litigant must demonstrate all four factors. *Id.* Judge Urbina observed that "[s]ome district judges have understandably interpreted [Circuit] precedent to mean that 'Plaintiffs are not required to prevail on each of these factors.'" *Id.* (quoting *Flynt v.*

*Rumsfeld*, 180 F.Supp.2d 174, 175 (D.D.C. 2002)). However, he stated,

> other district judges, including this one, have understandably interpreted precedent to require a showing on all factors. Both positions can be justifiably drawn from D.C. Circuit precedent ... [but] in this court's view, the best interpretation of Circuit precedent ... is that a party moving for injunctive relief must make a showing on *all four factors* to prevail but the strength of the showing can vary on each factor. Put in mathematical terms, a party seeking injunctive relief must make at least a 51 percent showing on each factor but since this might not be enough to grant this extraordinary relief, a 90 percent showing of likelihood of success on the merits, for example, can compensate for a mere 51 percent showing of irreparable harm. . . .

*Id.* (emphasis in original). Because the plaintiffs in *Adair* failed to demonstrate irreparable harm, Judge Urbina denied their request for injunctive relief. *Id.*

Judge Urbina's approach is in accord with the Circuit Court's holding in *CityFed* where

should be balanced against one another and, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995). Thus, injunctive relief may be warranted "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable harm." *Id.* However, a party seeking injunctive relief must "demonstrate at least 'some injury' ... since '[t]he basis for injunctive relief in the federal courts has always been irreparable harm.'" *Id.* (citations omitted). In addition, when granting mandatory injunctive relief, *i.e.*, an injunction that " 'would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from the denial of the injunction.'" *Columbia Hosp. for Women Foundation, Inc. v. Bank of Tokyo–Mitsubishi, Ltd.*, 15 F.Supp.2d 1, 4

(D.D.C.1997), *aff'd*, 159 F.3d 636, 1998 WL 203110 (D.C.Cir.1998) (quoting *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)). A district court should not issue a mandatory preliminary injunction " 'unless the facts and law clearly favor the moving party.'" *Id.* (citations omitted).

In addition, in this case, which has been brought pursuant to the Administrative Procedure Act ("APA"), the Court must decide, pursuant to 5 U.S.C. § 706(2)(A), whether "the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 5 U.S.C. § 706(2)(A); *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 16 (D.C.Cir.1998). In reaching its conclusion regarding this question, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citation omitted). Although the Court must make a detailed inquiry into the facts and circumstances underly-

the court stated that "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." 58 F.3d at 747. This language indicates that some showing on the other factors favoring injunctive relief must be made. *See also Davenport*, 166 F.3d at 367 (holding that "because plaintiffs [had] demonstrated neither [a] likelihood of success on the merits nor irreparable injury, the district court did not abuse its discretion in denying the motion for a preliminary injunction."). Indeed, in *Columbia Hosp. for Women Foundation, Inc. v. Bank of Tokyo–Mitsubishi, Ltd.*, 15 F.Supp.2d 1, 4 (D.D.C.1997), Judge Kollar Kotelly rejected the plaintiffs' claim that they were entitled to injunctive relief where they argued that they had "presented a sufficiently strong case on the second, third and fourth factors [enough] to relax their required showing on the merits." The court stated: "Plaintiffs' interpretation of the law of injunctions is myopic; it overlooks the

extraordinary relief they seek." *Id.* Notably, because the plaintiffs in *Columbia Hosp.* sought a mandatory injunction, the court stated that their reliance on *CityFed* as support for their proposition that they need not make a strong showing on all the injunctive-relief factors was not persuasive because "the *CityFed* Court [was] review[ing] the denial of a prohibitive preliminary injunction." *Id.* Furthermore, Judge Kollar–Kotelly stated that "[i]t is not as clear as Plaintiffs assume it to be that *CityFed* can also be read to hold that a particularly strong showing of irreparable injury can justify a preliminary injunction even if there is a relatively weak showing of likelihood of success on the merits." *Id.* at 4 n. 2. Because this Court concludes that plaintiff has failed to carry its burden on any of the injunctive relief factors, it need not discern whether under Circuit precedent plaintiff needed to prevail on each of the four injunctive relief factors to be entitled to injunctive relief.

ing the [Director's] actions, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* at 417, 91 S.Ct. 814. For example, it is well established that "[a]n agency's interpretation of its own regulations is entitled to deference 'unless it is plainly erroneous or inconsistent with the regulation.'" *Adams Telcom, Inc. v. FCC,* 38 F.3d 576, 579 (D.C.Cir.1994) (citation omitted). Furthermore, "reviewing courts will 'accord even greater deference to agency interpretations of agency rules than they do to agency interpretations of ambiguous statutory terms.'" *Id.* (citation omitted).

### A. *Likelihood of Success on the Merits*

### 1. The Parties' Arguments

Plaintiff argues that it can demonstrate a substantial likelihood of success on the merits because OPM's denial of plaintiff's application abridges plaintiff's First Amendment rights. Moreover, plaintiff contends that OPM's denial of plaintiff's application was arbitrary and capricious under the APA because (1) NCMAF fully complied with the OPM regulation requirement that it detail the services it provides in at least 15 states; (2) defendant failed to adequately justify its denial of NCMAF's application; (3) defendant failed to consider the supplemental materials submitted by NCMAF; and (4) defendant has treated similarly situated organizations differently than NCMAF. Pl.'s Mem. at 10–14.

In opposition, defendant first argues that because the CFC is a non-public forum, "restrictions on access to it are perfectly permissible under the First Amendment so long as the 'distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" Def.'s Opp'n at 17 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund,*

*Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)) (citing *Perry Educ. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Under this standard, defendant argues that the requirement that applicants provide or conduct real services or benefits is reasonable. Furthermore, defendant contends that the requirement that services be "real or actual" is not vague. *Id.* at 18. Defendant argues that plaintiff cannot establish a likelihood of success on the merits because it did not comply with OPM's guidelines/regulations as it "failed [to] adequately ... describe which of [its] services, benefits, assistance or program activities had been provided in *each* state over the previous three years." Def.'s Opp'n at 18 (emphasis in original) (citation omitted). Moreover, defendant submits that the agency's general counsel's willingness to consider the additional materials plaintiff sought to submit does not render the agency's final decision arbitrary and capricious because counsel was, at the time he agreed to review the additional information, "under the mis-impression that Plaintiff's administrative appeal was then still pending." Def.'s Opp'n at 25; Declaration of Mark Robbins ("Robbins Decl.") ¶ 8 (stating that he "made the offer to accept additional information under the mistaken understanding that the Deputy Director had not yet adjudicated the plaintiff's appeal."). In addition, defendant argues that to the extent Mr. Robbins indicated that the additional materials would be reviewed, those statements do not estop the defendant from adhering to its regulations, which expressly forbid the submission and consideration of materials that were not submitted with an applicant's initial application when deciding an appeal. *Id.* at 26–27.

### 2. Analysis

The Court must determine whether, under the APA, plaintiff has established a

likelihood of success in proving that the defendant's denial of its application was arbitrary, capricious, or contrary to the law. This question must be addressed because "[i]t is particularly important for the movant to demonstrate a substantial likelihood of success on the merits.... Indeed, absent a 'substantial indication' of the likely success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *Adair v. England*, 217 F.Supp.2d 1, 4 (D.D.C.2002) (citations omitted). For the reasons set forth below, the Court concludes that plaintiff has failed to satisfy this burden.

### (a) Plaintiff's First Amendment Argument

"Charitable solicitation of funds has been recognized by [the Supreme] Court as a form of protected speech." *Cornelius*, 473 U.S. at 797, 105 S.Ct. 3439 (citing *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)). However, there is "[n]othing in the Constitution [that] requires the Government [to] freely grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* at 799–800, 105 S.Ct. 3439 (citation omitted). In recognition of the fact that the government may reasonably limit citizens' access to its property, the

> [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control ac-

cess depends on the nature of the relevant forum.

*Id.* at 800, 105 S.Ct. 3439. Thus, in public fora, which are designed for "the free exchange of ideas," speakers can only be excluded "when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* (citation omitted). On the other hand, "[a]ccess to a nonpublic forum ... can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (citation omitted).

In *Cornelius,* the Court concluded that the CFC was a nonpublic forum, based on the Court's observation that "[t]he Government's consistent policy has been to limit participation in the CFC to 'appropriate' voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials." *Id.* at 804, 105 S.Ct. 3439. This "selective access[,]" the Court held, did "not create a public forum." *Id.* at 805, 105 S.Ct. 3439 (citation omitted). Accordingly, as a nonpublic forum, the government can limit access to the CFC so long as its limitations are *"reasonable;* [they] need not be the most reasonable or the only reasonable limitation[s]." *Id.* at 808, 105 S.Ct. 3439 (emphasis in original).

Plaintiff argues that the defendant's requirement that plaintiff "must demonstrate [it] provide[s] or conduct[s] 'real' or 'actual' services, benefits, assistance or program activities is ... vague because the terms 'real' or 'actual' services, benefits, assistance or program activities are not defined in the regulations." Pl.'s Mem. at 8. In support of this argument, plaintiff relies upon *NAACP Legal Defense & Educational Fund v. Campbell*, 504 F.Supp. 1365 (D.D.C.1981), wherein the court held that the OPM's exclusion of two charitable or-

ganizations from the CFC was arbitrary and capricious. There, the court held that the defendant's regulations providing that participating organizations must provide "direct services" was vague because the term was not defined anywhere in the regulations and "there [were] absolutely no established standards that would guide officials in determining whether or not an organization provides 'direct services.'" *Id.* Furthermore, in *Campbell,* the defendant was only able to justify its exclusion of the plaintiffs by using an analogy to "Legal Aid groups and Public Defenders," which it argued "provide 'direct services'...." *Id.* Thus, the court concluded that the "defendant's rejection of plaintiffs' applications to the CFC, based solely on a failure to satisfy the 'direct services' requirement of section 5.21 of the Manual must be set aside pursuant to this Court's review of agency action under the [APA][,]" and it granted summary judgment to the plaintiffs. *Id.* at 1369.

■ However, the *Campbell* case was decided prior to the Supreme Court's decision in *Cornelius,* in which the Court stated in dicta "that limiting CFC participation to organizations that provide direct and welfare services to needy persons ... [was] sufficient to provide reasonable grounds for excluding certain groups from the CFC...." 473 U.S. at 812, 105 S.Ct. 3439. More importantly, the regulation's requirement that participants provide "di-

rect services" is not the basis here upon which the agency concluded that plaintiff's application should be denied. As OPM notes in its opposition, "[p]laintiff's application was denied for failure to provide sufficient details to link the specific services provided with the states in which those services were provided. OPM was not resting its decision on the nature of the service[s][p]laintiff claimed to provide...." Def.'s Mem. at 18. In its reply, plaintiff does not further advance its vagueness arguments with respect to the delivery of real or actual benefits requirement. Therefore, the Court concludes that plaintiff is not entitled to its requested relief based on its argument that 5 C.F.R. § 950.202's requirement that plaintiff provide actual or real benefits and services is vague.[8]

**(b) Substantive Reasons for Denial of Plaintiff's Application**

In his letter affirming the denial of NCMAF's application, deputy director Blair stated that Attachment A must "clearly identify national and/or international services, benefits ... in 15 or more states ..." and that it was OPM's "view that the organization did not do so." Compl., Ex. D. Defendant argues that plaintiff failed to comply with 5 C.F.R. § 950.202 and OPM's guidance documents[9] by failing to "adequately ... de-

**8.** There is also an issue regarding whether plaintiff would have standing to raise this challenge as the regulation's requirement that plaintiff provide actual or real services was not invoked as grounds for excluding plaintiff from the CFC in this case.

**9.** Defendant notes that sample CFC applications, including samples of Attachment A, were available to the public on its website prior to the filing deadline. However, the declaration of Mara Patermaster, Director of CFC Operations, states that "guidance with regard to appropriate Attachment A submis-

sions is distributed *as needed* to local federal coordinating committees and principal combined fund organizations, and is made publicly available to organizations and federations on the Internet website http://www/ opm.gov/cfc/." Def.'s Opp'n, Ex. 9 (Declaration of Mara Patermaster) ¶ 11 (emphasis added). Thus, it appears that NCMAF and MVP did not directly receive notification of this document's availability from OPM. Furthermore, in its reply, plaintiff argues that a document that provided guidance for the preparation of Attachment A (Suggestions for

scribe which of [the] services, benefits, assistance or program activities had been provided in *each* state over the previous three years.... In short, [defendant argues that] [p]laintiff's application failed ... to indicate with any specificity *when*, *where*, and for *whom* specific services were provided." Def.'s Mem. at 18–19 (emphasis in original).

Pursuant to 5 C.F.R. § 950.202(a), to be eligible for listing in the CFC's national list, an organization must provide "[a] schedule listing those states (minimum 15) or the foreign countries (minimum 1) where the program activities have been provided and a detailed description of the activities in each state or foreign country must be included with the application." In its effort to comply with this regulation, plaintiff submitted Attachment A along with its original application, wherein it provided a list of 21 states where it had provided services or benefits in the immediate three prior years. Compl. Ex. A. It thereafter provided a listing of its actual services and benefits, in the format indicated below, which provided in part: [10]

*Listing and Description of Services, Benefits and Program Activities Provided in the years of 2000, 2001, and 2002*

- ✓ Counsel, consult, and train civilian clergy, Faith Group/ Denominational leadership, chaplains and military leaders ...

- ✓ Speak in churches [and] explain and promote our association mission and to recruit clergy for chaplain positions

- ✓ Visit military installations and VA medical centers throughout many states ...

- ✓ Conduct faith group and denominational chaplain training, workshops and conferences for chaplains and their families

- ✓ Send newsletters, make phone calls and send email to their chaplains for training, guidance and pastoral support

Compl., Ex. A (2003 National Organization Universal Application Form, Attachment A) at 1–2.

Defendant argues that the information plaintiff provided failed to satisfy 5 C.F.R. § 950.202's requirement that Schedule A provide "a detailed description of the activities in *each* state ..." as plaintiff did not list in which states the benefits were provided. Defendant interprets its regulation to require an applicant to provide a state-by-state listing of the benefits it has provided in each state. The Court finds that the words of the regulation support the defendant's interpretation, as it requires "a schedule listing those states ... where program activities have been provided" *and*, in addition, requires "a detailed description of the activities *in each state* ...." 5 C.F.R. § 950.202(a) (emphasis added). Thus, although plaintiff argues that it satisfied the requirements of section 950.202(a) by "provid[ing] a detailed listing of the services during each year and a

Schedule A) was not available at the time it submitted its application to MVP since it was not posted on the OPM website until December 20, 2002. Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Pl.'s Reply") at 3–4 (citing Williamson Decl. ¶ 5). Although the guidance document clearly identifies the type of information applicants should provide in their Attachment A forms, such as the who, what,

how, when and where the services were provided, it appears that plaintiff did not have the benefit of this document when it completed its application and the attachments.

10. Plaintiff provided a total list of 16 types of services it provides. Accordingly, what is set forth below is only a sampling of the services plaintiff indicated it has provided.

state-by-state listing of the *members* that provide such services[,]" Pl.'s Mem. at 3 (emphasis added), it is clear that although plaintiff provided a state-by-state listing of its Religious Faith/Denominational groups, it failed to provide a "detailed description of [its] activities in *each* state. . . ." 5 C.F.R. § 950.202(a) (emphasis added).

The *Adams Telcom* court upheld the agency's decision in a factually similar situation. There, several companies petitioned the Circuit Court for relief as a result of the Federal Communications Commission's ("FCC") denial of petitioners' "pioneer's preference applications [which sought] . . . licenses to use a portion of the radio spectrum to provide . . . services." 38 F.3d at 579. The regulation at issue required that each applicant "demonstrate that it . . . *ha[d] developed* the new service or technology; *e.g., that it . . . ha[d] developed capabilities or possibilities* of the technology or service or ha[d] brought them to a more advanced or effective state." *Id.* at 579–80 (quoting 47 C.F.R. § 1.402(a)) (emphasis in original). The FCC's Chief Engineer denied plaintiffs' applications in "a terse form letter explaining that [their] application[s] had been dismissed for failure to meet the Commission's filing requirements." *Id.* at 579 (internal quotation marks omitted). The denial was based on the plaintiffs' "fail[ure] to describe the specific attributes' of a proposed service or otherwise document a specific distinctive innovation or new technology for which a pioneer's preference [was] sought." *Id.* at 579 (citation and internal quotation marks omitted). Plaintiffs argued that the FCC's denial of their applications was arbitrary and capricious because "their applications did in fact meet the filing requirements[,]" and because the agency "had accepted . . . applications that were comparable to theirs, but had been filed before the Commission's . . . announcement of its May 4 deadline."

*Id.* The FCC affirmed the denials of plaintiff's applications. *Id.*

On appeal, the Circuit Court affirmed the FCC's denial of petitioners' applications. First, the Court noted that an agency's interpretation of its own rules is entitled to "even greater deference" than an "agency['s] interpretation[ ] of ambiguous statutory terms." *Id.* at 579 (citation and internal quotation marks omitted). Although finding the petitioners' interpretation of the regulation to mean that they needed to only "demonstrate[ ] that they had developed the 'possibilities' of new technologies or services" "colorable," the court held that the FCC's "construction— that a pioneer's preference application must demonstrate innovative work beyond the conceptualization of a new service . . . [was] clearly reasonable." *Id.* at 580. The agency's interpretation, the court reasoned,

> follow[ed] logically from the regulation's explicit requirement that an applicant demonstrate development and from the underlying goal of preferential licensing: to encourage investment of time and resources in research and development, not to enable those capable of beating the fastest path to the FCC office to control scarce public resources. The FCC's interpretation is also consistent with the regulation's requirement that an applicant either demonstrate its innovation's technical feasibility or apply for an experimental license.

*Id.* at 580. In addition, the *Adams Telcom* court rejected the petitioners' argument that the FCC's interpretation of the regulation could not have been "discerned from the section's text[ ][and] thus they were deprived of adequate notice of the requirement." *Id.* The court held that although applicants

are 'entitled to expect rules defining the required content of applications that are reasonably comprehensible .... [courts] do not require that the agency [make] the clearest possible articulation of application requirements.... Petitioners are not entitled to bright-line rules so long as they 'knew or should have known what the Commission expected of them.'

*Id.* (citations omitted). The court also rejected petitioners' arguments that the FCC had acted arbitrarily and capriciously "because it had accepted, for notice and comment, similar applications that had been submitted prior to April 3, 1992." *Id.* at 581. Although finding petitioners' argument "valid," the court "declined to reverse the Commission on this basis because the disparate treatment accorded those who had filed their applications before and after April 3 ... did not prejudice petitioners." *Id.* at 581. Finally, as in the case now before this Court, the *Adams Telcom* petitioners argued that the agency failed to "adequately explain the reasons for its decision." *Id.* at 582. While noting that the agency's letters "provided only brief explanations of why petitioners' applications failed to satisfy the pioneer's preference filing requirements, [the court held that] those explanations were sufficient for us (and the parties) to understand the basis for the decision[.]" *Id.*

 Like the *Adams Telcom* court, this Court can not discern a basis upon which to overturn the Director's decision. The Director's denial is based on a reasonable interpretation of OPM's regulations; it is in accordance with the Director's duty to "ensure the achievement of campaign objectives[,]" 5 C.F.R. § 950.102(c), and to uphold the agency's standards regarding participation of organizations in the CFC; and the justification for the denial adequately informed plaintiff that it had failed to describe the services it provides in each of the 21 states listed in Schedule A of plaintiff's application. Furthermore, because plaintiff applied for participation in the CFC through the MVP, which presumably had already been accorded federation status, it should have been aware of the exact requirements for CFC eligibility. Accordingly, the Court has no basis to reject the agency's determination that the regulation's requirement that "detailed description[s] of the activities in each state" be provided was not satisfied by the listing of plaintiff's services without also specifying in which states the services were provided. *See, e.g., Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (holding that Secretary's decision to apply a regulation to public employees was not unreasonable. The Court reasoned that "[b]ecause the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation.' ") (citations omitted); *Chadmoore Comm. Inc. v. FCC,* 113 F.3d 235, 289 (D.C.Cir.1997) (holding that the FCC's denial of the plaintiff's application for an extension of time in which to construct a " 'wide area specialized mobile radio ["SMR"]' system" was not arbitrary and capricious where the plaintiff "should have been aware that the FCC was embarking on a fundamental restructuring of wide-area SMR licensing procedures that made it imprudent to assume that the agency would continue to grant extensions ..." and where "the grant of [plaintiff]'s application would have significantly frustrated the interests that were to be advanced by the new rule ..."); *cf. Nat'l Center on Missing & Exploited Children v. Horner,* 699 F.Supp. 333, 336–37 (D.D.C.1988) (granting charitable organization's motion for a preliminary injunction, which permitted the organization to participate in the CFC, based on the

conclusion that the regulation at issue was ambiguous and the requirements that the agency sought to have the organization comply with "ha[d] been remitted in its current regulations.... OPM's action in denying [plaintiff's] application for participation in the ... CFC [was] inconsistent with, and contrary to, [the] CFC regulation....").

However, despite having concluded that the defendant's initial denial of plaintiff's application on the basis that it did not provide a detailed description of the services provided in each of the states it listed was proper, does not end the Court's analysis. This is because the Court must also consider plaintiff's argument about whether the agency acted arbitrarily and capriciously by not considering plaintiff's supplemental submission after OPM's general counsel mistakenly informed plaintiff that the supplemental material plaintiff was told it could submit would be considered. Although not characterized as such, in essence, plaintiff is arguing that the agency is estopped from refusing to consider its supplemental material based on Mr. Robbins' representations that the material would be reviewed and considered.

"Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Community Health Services*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). However, as defendant notes, application of the doctrine of estoppel cannot be imposed against the government "on the same terms as any other litigant." *Id.* at 60, 104 S.Ct. 2218 (footnote omitted). This legal distinction has been imposed by the Supreme Court because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interests of the citizenry as a whole in obedience to the rule of law is undermined." *Id.* Thus, a party seeking to invoke the doctrine of estoppel against the government must satisfy a "heavy burden." *Id.* at 61, 104 S.Ct. 2218.

■ To establish a claim of estoppel, a party must demonstrate that it "relied on its adversary's conduct 'in such a manner as to change his position for the worse[ ]' ... and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* at 59, 104 S.Ct. 2218 (citations and footnotes omitted). Although plaintiff is essentially asserting estoppel, it does not characterize its argument as an estoppel claim in its papers, and for good reason. First, plaintiff did not rely on Mr. Robbins' representations to its detriment. In fact, once its appeal was denied, which occurred before Mr. Robbins made his representations, plaintiff had no further recourse before the agency. *See* 5 C.F.R. § 950.102 ("The decisions of the Director are final for administrative purposes."). Second, even if there had been reliance, plaintiff should have known that Mr. Robbins' representations were misleading and in direct contravention of the agency's own regulations, which provide, in part, that "[r]equests for reconsideration may not be used to supplement applications that had missing documents ... and any such documents submitted with the request for reconsideration *will not be considered.*" 5 C.F.R. § 950.205(a) (emphasis added). Therefore, the Court concludes that the representations of OPM's general counsel do not rise to a level sufficient to invoke the consequences of estoppel against the entire agency (and the citizenry) because of his statements. Accordingly, to the extent the plaintiff is attempting to raise an estoppel-like argument, relief on such grounds is not available in this case.

Finally, the plaintiff argues that three other organizations were initially denied participation in the CFC and, after initiating lawsuits, were subsequently determined eligible for participation. Pl.'s Mem. at 12. In addition, attached to its reply, plaintiff provides the declaration of Linda Mansfield, president of MVP, wherein she contends that "OPM has routinely found applications to be compliant that contained the type of information and were in the form of NCMAF's application." Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Pl.'s Reply"), Declaration of Linda Mansfield dated August 21, 2003 ("Mansfield Decl.") ¶ 3. Although it is well established "that an agency must provide an adequate explanation before it treats similarly situated parties differently[,]" *Chadmoore Comm. Inc.*, 113 F.3d at 242 (citation omitted), the problem with the challenge being advanced by the plaintiff here is that the Court has no basis upon which to conclude that the agency has treated similarly situated parties differently. The Court has no knowledge about the circumstances underlying the defendant's dispute with the other organizations who settled their lawsuits with the defendant. For example, plaintiff has failed to attach the Attachment A forms of the other organizations who settled their lawsuits and are now being permitted to participate in the CFC. Also of note, plaintiff has not submitted any of the other seven applications submitted to OPM by MVP, which presumably satisfied the regulation's requirements since none of these other groups were found to be ineligible for CFC listing, to show that OPM has found Attachment A forms similar to plaintiff's acceptable, if in fact these other forms are similar to what plaintiff presented. Thus, plaintiff has failed to establish that it is likely to succeed on its claim that the agency has acted arbitrarily and capriciously by treating similarly situated parties dissimilarly. *See id.* (rejecting plaintiff's argument that the agency had granted the applications of two other companies that were similarly situated to the plaintiff, noting that on the record currently before it, "it [was] not possible to determine whether [the agency's] conditional authorizations were withdrawn[,]" and concluding that "even if the Commission did not revoke the extensions, [the court would still have to find plaintiff's] contention without merit because the applicants were not 'similarly situated.' [The applicants were dissimilar because the plaintiff's] application covered 2,312 stations in twenty-six states while the others' were limited, respectively, to eleven stations in four states and four stations in two states."); *Adams Telcom*, 38 F.3d at 581–82 (rejecting petitioners' argument that the FCC treated earlier applicants differently from the plaintiff, although the applications were similar. "[C]ontrary to the position taken by petitioners, the Commission's error was its failure to dismiss the early filers' applications for the same reason that it later dismissed those of the late filers—not its failure to treat the latter as it had the former. 'A remand is unnecessary where, as here, the outcome of a new administrative proceeding is preordained.' ... The FCC is bound by its pioneer's preference rules.") (citations omitted).

For all of the above reasons, the Court cannot conclude that there is a substantial likelihood that plaintiff will prevail on its argument that the defendant acted arbitrarily and capriciously when it denied plaintiff's application for participation in the 2003 CFC.

**B.** *Irreparable Harm*

Plaintiff alleges that it will suffer irreparable harm if relief is not provided by the

Court. This is so, plaintiff claims, because it will be "deprived of the exercise of its First Amendment right to communicate its message to millions of federal employees who otherwise would not have the opportunity to receive this information." Pl.'s Mem. at 16. In addition, because "[t]he CFC is the exclusive means whereby federal employees may be solicited for charitable contributions in the workplace[,]" plaintiff emphasizes that without the Court's intervention it will be precluded from seeking financial support from this audience. *Id.*

■ The Court is not insensitive to plaintiff's concern about the harm it might possibly sustain if it is denied the opportunity to participate in this year's CFC. However, participation in the CFC is not an absolute right. *Cornelius*, 473 U.S. at 808, 105 S.Ct. 3439 ("The Government's decision to restrict access to a non-public forum need only be reasonable."). As a non-public forum, the CFC is "by definition . . . not dedicated to general debate or the free exchange of ideas." *Id.* at 811, 105 S.Ct. 3439. Thus, plaintiff has no guaranteed First Amendment right to participate in the CFC.

Furthermore, the harm that plaintiff will suffer, *i.e.*, the loss of potential contributions that it might receive through participation in the CFC, is entirely speculative, which is all the more the case because it appears that plaintiff has not previously participated in the CFC. Def.'s Mem. at 29. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988) (citation omitted); *see also Campbell*, 504 F.Supp. at 1369 (noting that there was "no factual basis" by which "a reasonable sum could be determined" regarding plaintiff's losses "for their wrongful exclusion from the

1980" CFC and denying plaintiff's request for a "disbursement from the 1981 CFC receipts [to] . . . compensate them for their wrongful exclusion from the 1980 Campaign."). Thus, although plaintiff quite possibly will suffer some harm by the denial of its application to participate in the 2003 CFC, this harm is speculative and is not based on the denial of a right to which plaintiff was entitled.

**C. Harm to Other Parties**

Plaintiff states that "[n]o other parties will suffer harm if the relief requested by NCMAF is granted." Pl.'s Mem. at 17. This is the case, it claims, because the list of 2003 CFC organizations "can [easily] be updated and revised by the Director to include NCMAF and posted to OPM's website. . . ." *Id.* Furthermore, plaintiff contends that even if brochures have already been printed and distributed, an Errata Sheet can be distributed separately to the LFCCs to be distributed to employees. *Id.* at 17–18. Thus, according to plaintiff, defendant will not be harmed by its inclusion in the 2003 campaign. In opposition, defendant argues that other parties would be harmed if plaintiff were permitted to participate in this year's CFC because "contributions from past supporters of other organizations will be diverted to the [p]laintiff." Def.'s Mem. at 30. In addition, defendant posits that "[f]airness to all applicants dictates evenhanded application of the rules and adherence to the requirement of complete and accurate, timely filed applications." *Id.*

■ The Court finds that, despite plaintiff's assertions to the contrary, the defendant would suffer harm if plaintiff is granted the relief it seeks. This is so because the CFC "would be administratively unmanageable if access could not be curtailed in a reasonable manner." *Cornelius*, 473 U.S. at 809, 105 S.Ct. 3439. Thus, there

could be harm to the agency's ability to apply and adhere to its own requirements for participation in the CFC if plaintiff is granted the relief it seeks. *See id.* at 810–811, 105 S.Ct. 3439 (holding that the record before the Court "amply support[ed] an inference that [the organization's] participating in the CFC jeopardized the success of the Campaign ..." and thus OPM would be justified in excluding the organization if its exclusion was not motivated "by a desire to suppress a particular point of view."). Therefore, the Court rejects plaintiff's argument that no other party would be harmed if the relief it seeks is granted.

### D. Public Interest

Finally, plaintiff argues that permitting it to participate in the 2003 CFC is in the public interest because it allows NCMAF to "continue to assist in recruiting and training a diverse group of chaplains that serve the spiritual needs of United States military and VA hospital personnel." Pl.'s Mem. at 18. In addition, plaintiff opines that because the defendant misled NCMAF into believing that its additional materials would be reviewed and considered, its behavior should not be rewarded by the Court. The Court does not disagree that plaintiff's mission is honorable or that the defendant's general counsel should not have misinformed plaintiff about the supplemental information it presented. Nonetheless, the Court concludes that the public interest favors OPM having the ability to compel adherence with its CFC regulations. *See DRG Funding Corp. v. Secretary of Housing & Urban Dev.,* No. Civ.A. 88–2202, 1988 WL 90107, at *7 (D.D.C. Aug.12, 1988) ("Of substantial importance ... is the public's interest in relying on an agency's strict adherence to its own regulations...."). The Court

reaches this conclusion because although NCMAF's efforts might be enhanced if its funding base is enlarged by its participation in the CFC, like the Court's conclusion about the irreparable harm factor, this too is somewhat speculative. Moreover, chaplain efforts have been a longtime component of the military community and plaintiff has presented nothing to suggest that those efforts will be diminished if it is denied participation in the 2003 CFC.

Accordingly, for the reasons set forth above, plaintiff's motion for a temporary restraining order and a preliminary injunction is DENIED.

**SO ORDERED** on this 27th day of August, 2003.[11]

### *ORDER*

In accordance with the Court's Memorandum Opinion, it is hereby

**ORDERED** that plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [# 3] is **DENIED.**

---

11. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.